[S.F. No. 24326. Oct. 28, 1982.]

MARTHA FOLSOM et al., Plaintiffs and Respondents, v.
BUTTE COUNTY ASSOCIATION OF GOVERNMENTS et al.,
Defendants and Appellants.

**COUNSEL**

Daniel V. Blackstock, County Counsel, Delbert Siemsen, Acting County Counsel, Leonard & Lyde and Gerald Hermansen for Defendants and Appellants.

Daniel L. Siegel, Alan Lieberman, Michael R. Bush, Andrew T. Holcombe, Roberta Ranstrom and Martin H. Flam for Plaintiffs and Respondents.

## Opinion

NEWMAN, J.—In a settlement agreement silent as to costs and attorney fees, plaintiffs promised to dismiss their action, with prejudice, on substantial performance of defendants' promise to establish four transit systems. Our central question is whether that agreement operates as a merger and bar of all preexisting claims, depriving the trial court of jurisdiction to award costs and statutory attorney fees. (Code Civ. Proc., §§ 1032, 1021.5)[1]

If the agreement is not a bar, we must decide whether, under section 1021.5, (1) fees may be awarded to legal services groups funded primarily by public monies, and (2) a litigant who settles may be a "successful party."

We conclude that an agreement silent as to costs and fees does not create a bar to either a cost bill or a motion pursuant to section 1021.5. We also conclude that the fee award here was proper, that an award may be made under section 1021.5 to a legal services group funded primarily by public monies, and that a claimant settling a lawsuit may be a "successful party" within the meaning of the section if the underlying action contributed substantially to remedying conditions at which it was directed.

Plaintiffs are resident taxpayers of Butte County who aver they are elderly, disabled, of limited means and, hence, transit-dependent. They sought declaratory and injunctive relief against county allocations to street and road projects of funds collected under the Transportation Development Act of 1971 (Act). (Gov. Code, §§ 29530-29536; Pub. Util. Code, §§ 99200-99407 [also known as the Mills-Alquist/Deddeh Act].[2] The

[1]Section 1032, subdivision (c), provides that in actions not enumerated in subdivisions (a) and (b) "costs may be allowed or not . . . in the discretion of the court."

Section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

[2]Plaintiffs asserted standing under section 526a of the Code of Civil Procedure, which states: "An action to obtain a judgment, restraining and preventing any illegal expenditure of . . . funds . . . of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person acting in its behalf . . . by a citizen resident therein . . ." (See *Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 447 [166 Cal.Rptr. 149, 613 P.2d 210]: "Section 526a authorizes a taxpayer to file '[a]n

Act was based on legislative findings that "public transportation systems provide an essential public service" and should be so designed and operated "as not to deprive the elderly, the handicapped, the youth, and the citizens of limited means of the ability to freely utilize" them. (Pub. Util. Code, § 99220.[3]) The Legislature further found "[i]t . . . in the interest of the state that funds available for transit development be fully expended to meet the transit needs that exist in California." (§ 99222.)[4] Under the Act counties are authorized to contract with the Board of Equalization to increase taxes on motor vehicle fuel by 1 percent and to deposit that increment in a local fund for allocation by a local transportation planning agency for purposes set forth in the Act.

---

action to . . . prevent [] any illegal expenditure of . . . funds . . . of a . . . city and county of the state . . . .' 'The primary purpose of this statute, originally enacted in 1909, is to "enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement." ' (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-268 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].) That section provides 'a general citizen remedy for controlling illegal governmental activity.' (*White* v. *Davis* (1975) 13 Cal.3d 757, 763 [120 Cal.Rptr. 94, 533 P.2d 222]; *Wirin* v. *Parker* (1957) 48 Cal.2d 890, 894 [313 P.2d 844], citation omitted.).")

[3]Section 99220 provides in pertinent part: "The Legislature finds and declares as follows:

"(a) Public transportation is an essential component of the balanced transportation system which must be maintained and developed so as to permit the efficient and orderly movement of people and goods in the urban areas of the state. Because public transportation systems provide an essential public service, it is desirable that such systems be designed and operated in such a manner as to encourage maximum utilization of the efficiencies of the service for the benefit of the total transportation system of the state and as not to deprive the elderly, the handicapped, the youth, and the citizens of limited means of the ability to freely utilize the systems.

"(b) The fostering, continuance, and development of public transportation systems are a matter of state concern. Excessive reliance on the private automobile for transportation has caused air pollution and traffic congestion in California's urban areas, and such pollution and congestion are not confined to single incorporated areas but affect entire regions. Furthermore, public transportation systems which are not designed so as to be usable by handicapped persons foster increased welfare costs and the waste of human resources. Thus, the Legislature has elected to deal with the multiple problems caused by a lack of adequate public transportation on a regional basis through the counties, with coordination of the programs being the responsibility of the state pursuant to contract with county governments.

"(c) While providing county assistance to a particular transportation system may not be of primary interest and benefit to each and every taxpayer in a county, providing an integrated and coordinated system to meet the public transportation needs of an entire county will benefit the county as a whole. It is the purpose of this chapter to provide for such systems in those counties where they are needed."

[4]Section 99222 provides: "The Legislature hereby finds and declares that:

"(a) It is in the interest of the state that funds available for transit development be fully expended to meet the transit needs that exist in California.

"(b) Such funds be expended for physical improvement to improve the movement of transit vehicles, the comfort of patrons, and the exchange of patrons from one transportation mode to another."

Under implementing regulations (Cal. Admin. Code, tit. 21, §§ 6600-6680) the local agency may not allocate funds collected under the Act (TDA funds) to local streets and roads until it has held a hearing, on 10 days' public notice, and determined in a public record that there are "no unmet public transportation needs" within the jurisdiction. (Cal. Admin. Code, tit. 21, § 6658.) "The determination of no unmet transit needs which can reasonably be met must make specific reference to the efforts undertaken in the development of the Regional Transportation Plan to identify the public transportation needs of the transit dependent, especially the elderly, handicapped and poor . . . ." (*Ibid.*)

Since 1972, TDA funds have been collected and allocated by the Butte County Association of Governments (BCAG).[5] In November 1978 BCAG adopted resolutions stating that no unmet public transit needs existed in Biggs (Res. 78-2), Gridley (78-3), Oroville (78-4), Chico (78-5), or Butte County (78-6) and, accordingly, allocating all available TDA funds to street and road projects. Thus the request of the Chico City Council that $140,400 be allocated to an intracity system in Chico was rejected.

Plaintiffs filed their action on December 5, 1978, seeking relief against BCAG, the Cities of Gridley, Oroville, and Biggs, Butte County, and the county auditor-controller as trustee of the county's TDA funds (Local Defendants), as well as against the state officials responsible for administering the Act, viz., the Secretary of the Business and Transportation Agency and the Director of the Department of Transportation (State Defendants). Plaintiffs averred that BCAG's allocations for fiscal 1973-1974 through 1978-1979 were invalid for failure to identify unmet transit needs and to comply with section 6658 of the regulations. They sought to enjoin further allocations and to rescind unexpended allocations to street and road projects until "such time as an adequate public transportation system is operating which reasonably meets the public transit needs in the incorporated and unincorporated areas of Butte County." They also sought an order that BCAG approve the request of the Chico City Council and that State Defendants establish a system whereby local-agency allocation decisions would be reviewed. The prayer included a request for costs and statutory attorney fees.

All defendants answered except the county auditor-controller, who informed county counsel by memo of December 18, 1978, that he deemed his involvement purely ministerial and hence intended to neither answer nor demur. The memo stated that "sufficient cause [appeared] for the

---

[5]BCAG was created in 1969 by Chico, Oroville, Gridley, Biggs, and the County of Butte. In 1978 it had nine seats, five held by county supervisors and four by mayors of the founding cities.

complaint" and that the controller intended not to release *"any* TDA . . . monies to *any* entity for *any* purpose, unless so ordered by a court of competent jurisdiction during the remainder of [his] term of office." (Italics in original.)[6] The parties stipulate that the effect of this decision was to freeze approximately $3 million in TDA funds.

In June 1979 BCAG rescinded all prior allocations for street and road purposes, and Local Defendants moved for partial summary judgment on two principal grounds:[7] (a) that relief for years prior to 1978-1979 should be denied for mootness because those allocations had been rescinded and restored to the fund, and (b) that section 6658 of title 21 of the California Administrative Code was invalid as having been in excess of the authority of the Secretary of the Business and Transportation Agency to promulgate. State Defendants objected to the motion alleging inter alia that rescission of prior years' allocations violated both section 6648 and section 6659 of the regulations.[8]

After a hearing on July 6, 1979, the trial court granted the motion in an order entered November 1, 1979, which struck all averments relating to the regularity or adequacy of prior TDA allocations on condition that BCAG (1) rescind all outstanding allocations from the local fund, (2) refrain from encumbering or expending funds not encumbered on July 6, 1979, until such time as there were further allocations, and (3) preface 1979-1980 allocations with a survey of unmet needs "as required by the statutes and the regulations." The court thus denied the motion insofar as it was based on alleged lack of authority of the Secretary to adopt section 6658 and expressly found such regulation valid. The court also retained jurisdiction "until the allocations have been made to assure that they have been made in accordance with the plan, the statutes, and the regulations"

---

[6]Though the controller's term expired January 9, 1979, a similar statement of intent was made by his successor the following day.

[7]Meanwhile, in April 1979, area 2 of the developmental disabilities board notified BCAG of noncompliance with both section 99222 of the Public Utilities Code (see fn. 4, *ante*) and section 6658 of title 21 of the California Administrative Code, as evidenced by BCAG resolutions 78-2 through 78-6 of 1978 and "invalid information" set forth therein.

[8]Section 6648 provides that allocated funds reserved in the local fund may be reallocated and that an allocation may be rescinded, but only after three years and then only on 30 days' notice to a claimant.

Section 6659 provides: "Once an allocation instruction has been made, it may be rescinded and revised by the transportation planning agency only under one of the following circumstances: [¶] (a) An appeal affecting the allocation . . .; [¶] (b) The claimant is found to be spending . . . moneys otherwise than in accordance with the terms of the allocation instruction; [¶] (c) An adjustment is proved to be necessary . . .; or [¶] (d) The financial needs of the claimant differ from those at the time of the allocation due to changed circumstances."

and accorded leave to plaintiffs to amend their complaint "to allege irregularities in the ultimate allocations."

The settlement agreement was filed on January 7, 1980. Its stated purpose was "to settle plaintiffs' claim regarding the alleged improper allocations of ltf [local transportation fund] monies between 1974 and 1978, and any claims regarding the legality of ltf allocations made for fiscal year 1979-1980." In consideration for Local Defendants' promise to establish four new transit systems[9] plaintiffs promised to (1) inform the county auditor and fiscal officers of Oroville, Gridley, and Biggs that "all funds frozen as a result of this lawsuit may be immediately released without challenge from plaintiffs" and (2) "file with the Court a dismissal of Local Defendants, with prejudice, within one week of the date that the last new transit system has initiated service as defined in ¶10 below." Paragraph 10 provided that "[a] new transit system shall be deemed to have initiated service when service has been established on all routes and within the hours of service as provided [elsewhere in the agreement]."

On January 17, 1980, plaintiffs filed a cost bill and also a motion for attorney fees under section 1021.5. Defendants opposed both, on grounds urged in this appeal. On April 18, 1980, the court ruled that plaintiffs were entitled to an award of fees and pronounced them "'successful parties', *inter alia,* by virtue of the condition in the Court's order of November 1, 1979, to the effect that the Butte County Association of Governments rescind all remaining outstanding allocations of money from the local transportation fund. This obviously became at least one of the bases for B.C.A.G.'s further action in meeting the transportation needs of Butte County."[10]

After proceedings on computation the court on August 1, 1980, awarded fees of $35,257.50[11] and costs, as requested, of $2,068. The order declared

---

[9]The four systems were (1) an inter-city system open to the public that connected Chico, Oroville, Paradise, Biggs, Gridley, and the Gridley Labor Camp, (2) a fixed-route system open to the public that operated within the Chico urban area, (3) a similar system within the Oroville urban area, and (4) a system whereby elderly and handicapped residents of any city in the county might utilize transit services for the elderly and handicapped in any other city. It was estimated that the four systems would serve between 267,000 and 335,600 one-way passengers per year.

[10]The order added: "This is not to say that the matters discussed in local defendants' written memoranda should not be considered in setting fees. They should be and will be. The court has determined only that some fees are due."

[11]Plaintiffs sought a rate of $90 an hour for 1,175.25 hours of time, plus 40 percent enhancement for factors such as novelty, complexity, and results achieved. The court found that "an excessive amount of time was spent and that the hours to be compensated should be one-third less, or 783.5 hours." The court also found a reasonable hourly rate to be $45 an hour and denied enhancement of the touchstone figure. (See generally *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 48-49 [141 Cal.Rptr. 315, 569 P.2d 1303] [*Serrano III*].)

that "this action has resulted in the enforcement of an important right affecting the public interest in that, inter alia, public transit funds have been allocated to meet public transit needs in Butte County; that a significant benefit has been conferred on both a large class of persons and on the general public; [and] that the necessity and financial burden of private enforcement are such as to make this award of attorney's fees appropriate."[12] Defendants appeal.*

I

Defendants contend the agreement operated as a merger and bar of all issues framed by the complaint and hence left the trial court without jurisdiction to award costs or fees. They rely on language in *Gregory* v. *Hamilton* (1978) 77 Cal.App.3d 213 [142 Cal.Rptr. 563].[13] Plaintiffs respond with cases holding to the contrary, viz., *Rappenecker* v. *Sea Land Service, Inc.* (1979) 93 Cal.App.3d 256 [155 Cal.Rptr. 516] (agreement silent as to costs), *Chicano Police Officer's Ass'n* v. *Stover* (10th Cir. 1980) 624 F.2d 127 (agreement silent as to statutory fees), and *Regalado* v. *Johnson* (E.D.Ill. 1978) 79 F.R.D. 447 (agreement silent as to costs and statutory fees). They also urge that their attorneys refrained from injecting fee issues into negotiations on the merits in deference to judicial admonitions that such conduct is improper.[14]

---

[12] We are informed that the action was dismissed with prejudice on February 22, 1982.

*After the orders were entered, defendants by letter informed the court that the cost award was in error because no judgment had been entered. (Code Civ. Proc., § 1032, subd. (a).) Plaintiffs responded by letter that costs may be awarded before judgment in injunctive actions. (*Id.*, subd. (c); *Lewin* v. *Board of Trustees* (1976) 62 Cal.App.3d 977, 983-984 [133 Cal.Rptr. 385].) The court concluded on receipt of defendants' letter that the cost award was premature. It then ruled, however (after consideration of plaintiffs' letter), that the orders originally signed should remain standing.

[13] "[I]t is recognized that a compromise agreement operates as a merger and bar of all preexisting claims and causes of actions (12 Cal.Jur.3d, Compromise, Settlement, and Release, § 55, p. 353) and is as binding and effective as a final judgment itself (*Armstrong* v. *Sacramento Valley R. Co.* (1919) 179 Cal. 648, 651 [178 P. 516])." (*Gregory* v. *Hamilton, supra,* 77 Cal.App.3d at p. 221, distinguished on other grounds in *Hastings* v. *Matlock* (1980) 107 Cal.App.3d 876, 882-883, fn. 6 [166 Cal.Rptr. 229].)

[14] See, e.g., *Anthony* v. *Superior Court* (1976) 59 Cal.App.3d 760 [130 Cal.Rptr. 758]: " '[W]e join the *Norman* court in admonishing counsel that it is inappropriate for a proposed settlement to provide for direct payment of attorneys' fees to counsel . . . . *Norman* v. *McKee,* 290 F.Supp. at 36. See also *City of Philadelphia* v. *Charles Pfizer & Co.,* 345 F.Supp. 454, 470-471 (S.D.N.Y. 1972). Rather, the issue of attorneys' fees is more properly reserved for judicial consideration after settlement of the gross amount to be paid to the class. The present arrangement leaves the unfortunate impression that defendants are buying themselves out of a lawsuit by direct compensation of plaintiffs' counsel.' " (*Anthony, supra,* at p. 772, citing *Jamison* v. *Butcher & Sherrerd*

■ As we explain below we adopt neither party's view. Compromise has long been favored. (*Rohrbacher* v. *Aitken* (1904) 145 Cal. 485, 488 [78 P. 1054]; *Armstrong* v. *Sacramento Valley R. Co., supra,* 179 Cal. 648, 650.) "[A] valid compromise agreement has many attributes of a judgment, and in the absence of a showing of fraud or undue influence is decisive of the rights of the parties thereto and operates as a bar to the reopening of the original controversy." (*Shriver* v. *Kuchel* (1952) 113 Cal.App.2d 421, 425 [248 P.2d 35].)

■ Compromise agreements are, of course, "governed by the legal principles applicable to contracts generally." (*Ibid.*) They "regulate and settle only such matters and differences as appear clearly to be comprehended in them by the intention of the parties and the necessary consequences thereof, and do not extend to matters which the parties never intended to include therein, although existing at the time." (*Lemm* v. *Stillwater Land & Cattle Co.* (1933) 217 Cal. 474, 482 [19 P.2d 785]; accord, *Armstrong* v. *Sacramento Valley R. Co., supra,* 179 Cal. at p. 651.) Thus they ordinarily conclude all matters put in issue by the pleadings—that is, questions that otherwise would have been resolved at trial. (See, e.g., *Ellena* v. *State of California* (1977) 69 Cal.App.3d 245, 260 [138 Cal.Rptr. 110].) They do not, however (absent affirmative agreement of the parties), conclude matters incident to the judgment that were no part of the cause of the action.

It is established that the right to costs is statutory and that costs "are allowed solely as an incident of the judgment given upon the issues in the action. (See *Begbie* v. *Begbie,* 128 Cal. 154 [66 P. 667].) . . . They constitute no part of a judgment at the moment of its rendition . . . ." (*Whitaker* v. *Title Ins. etc. Co.* (1918) 179 Cal. 111, 113 [175 P. 460]; see also *Wells Fargo & Co.* v. *City etc. of S. F.* (1944) 25 Cal.2d 37, 44 [152 P.2d 625]; *McCallion* v. *Hibernia etc. Society* (1893) 98 Cal. 442, 445-446 [33 P. 329]; *Gray* v. *Dougherty* (1864) 25 Cal. 266, 282.) Thus it is that costs are allowed, absent the parties' express agreement to the contrary, following entry of a consent decree. (*Rappenecker* v. *Sea-Land Service, Inc., supra,* 93 Cal.App.3d 256.)

The agreement in *Rappenecker,* which was silent as to costs, provided that it was "in full compromise settlement of [plaintiff's] claims

(E.D.Pa. 1975) 68 F.R.D. 479, 484; accord, *Obin* v. *Dist. No. 9, Intern. Ass'n. etc.* (8th Cir. 1981) 651 F.2d 574, 582-583; *Mendoza* v. *United States* (9th Cir. 1980) 623 F.2d 1338, 1353 ["evil of simultaneously negotiated attorney fee" neutralized by active participation of Justice Department in negotiation], cert. den. 450 U.S. 912 [67 L.Ed.2d 336, 101 S.Ct. 1351]; *Regalado* v. *Johnson, supra,* 79 F.R.D. at p. 451; *Lyon* v. *State of Ariz.* (D.Ariz. 1978) 80 F.R.D. 665, 669 ["a direct conflict of interest and is impermissible"].)

regarding his service aboard the SS *Mayaguez.*" The Court of Appeal observed that "[c]osts of suit do not fall within such service. . . . 'Costs are allowances which are authorized to reimburse the successful party to an action or proceeding and are in the nature of incidental damages to indemnify a party against the expense of successfully asserting his rights.' (*Purdy* v. *Johnson* (1929) 100 Cal.App. 416, 418 [280 P. 181].) By its failure to draft with precision its compromise offer, defendant cannot now be heard to claim that its language precludes the award of costs." (93 Cal.App.3d at p. 264.)[15] Similarly, in *Slater* v. *Superior Court* (1941) 45 Cal.App.2d 757 [115 P.2d 32] plaintiff's waiver of a portion of the damages awarded was held no bar to a cost award. "If no mention of costs has been made in the waiver . . . the legal effect would have been that [plaintiff] would be entitled to costs. This follows from the fact that costs are not an integral part of the judgment—they are but an incident to the judgment." (*Id.* at p. 761 [citations omitted].)

The same reasoning applies to attorney fees that are authorized solely by statute and hence are not a part of the cause of action.[16] They are incidents to the cause, properly awarded after entry of a stipulated judgment, unless expressly or by necessary implication excluded by the stipulation. For example, in *Rapp* v. *Spring Valley Gold Co.* (1888) 74 Cal. 532 [16 P. 325] judgment for plaintiffs had been entered on a stipulation silent as to statutory fees.[17] The sole question was plaintiff's entitlement to fees. Defendants argued that the stipulation, which merely set forth amounts due plaintiff from defendants, was an implied fee waiver. This court rejected

---

[15]The *Rappenecker* action was settled under section 998 of the Code of Civil Procedure, which provides that a party who rejects an offer of compromise made 10 days before trial and who fails to obtain a "more favorable judgment" shall be denied costs. The Court of Appeal noted that one cannot infer a legislative intent to deny costs when a compromise offer has been *accepted.* "[O]ne should not read into the statute allowing costs a restriction which has not been placed there." (93 Cal.App.3d at p. 263.)

[16]To be distinguished are situations where fees are part of the relief sought and hence must be pleaded and proved at trial. (See generally 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 118, pp. 3269-3270.) As the court explained in *Mabee* v. *Nurseryland Garden Centers, Inc.* (1979) 88 Cal.App.3d 420 [152 Cal.Rptr. 31]: "[W]here attorney fees are incurred in a prior action, or sought in a proceeding as damages—as for example in false imprisonment or malicious prosecution suits—or where recovery is sought in an action by an attorney against his client for an agreed or a reasonable fee, then the claim for attorney fees is part of the damage sought in the principal action. Only in such circumstances would the attorney fee be required to be pleaded and proven—as any other item of damages—at trial. No similar procedural and evidentiary base is required where 'the attorney fee was not the cause of action but an incident to it.'" (*Id.* at p. 425, citing *Huber* v. *Shedoudy* (1919) 180 Cal. 311, 314 [181 P. 63].)

[17]Under former section 1195 of the Code of Civil Procedure fees were allowed in actions to foreclose mechanics' liens "to each lien claimant whose lien was established, whether he be plaintiff or defendant." The statute was declared violative of equal protection in *Builders' Supply Depot* v. *O'Connor* (1907) 150 Cal. 265 [88 P. 982].

the assertion, stating: "This argument proves too much. It would exclude a judgment for costs as well as for attorney's fees. Costs are not a part of the amount due to the plaintiffs; but it is not disputed by appellants that the judgment for costs was proper. The attorney's fee in this kind of case is not, strictly speaking, part of the costs. . . . But it was properly allowed for the same reason that costs were allowed, viz., that it was a necessary incident of the judgment stipulated for, and was not expressly, or by necessary implication, excluded by the stipulation." (*Id.* at p. 533.)

Defendants urged in *Rapp* that the parties' understanding was that no fees would be sought. This court was unpersuaded. "Upon a proper application the trial court could have relieved [defendants] from a stipulation given through a misunderstanding. No such application was made. After being informed of what the plaintiffs were going to do, the defendants chose to rely upon the stipulation, which, as we have seen, does not support their view." (74 Cal. at p. 535 [citation omitted].)

Therefore, absent affirmative agreement of the parties to the contrary, the trial court retains jurisdiction after the filing of a compromise agreement to entertain a cost bill. It also retains jurisdiction to consider a statutory fee motion—at least where the showing required by statute could not have been made prior to judgment.[18] Code of Civil Procedure section 1021.5 is such a statute. It requires the claimant to show that the principal action "has resulted" in the enforcement of an important right and that a significant benefit "has been conferred." (See fn. 1, *ante.*) That showing cannot be made until the benefit is secure, in some cases after judgment is final. (See, e.g., *Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 835 [160 Cal.Rptr. 465]; cf. *Painter* v. *Estate of Painter* (1889) 78 Cal. 625 [21 P. 433].[19])

As the United States Supreme Court recently observed as to fee motions under the Civil Rights Attorneys' Fees Awards Act (42 U.S.C.

---

[18]Cf. *Plumbing etc. Employers Council* v. *Quillin* (1976) 64 Cal.App.3d 215, 222 [134 Cal.Rptr. 332] (no jurisdiction to hear postjudgment fee motion under Gov. Code, § 800 because requisite showing "inextricably related to the merits" and could have been made before judgment).

[19]*Painter* affirmed a postjudgment award of fees on appeal under a statute providing that a claimant recovering "no judgment" must pay "all costs, including defendant's reasonable attorney's fees." (Former Code Civ. Proc., § 1510 [now Prob. Code, § 703].) "Under that statute, no attorney's fees could be fixed or allowed by any tribunal for services performed before the appellate court by the attorney appointed by the superior court, until the court of last resort had made it a finality that the plaintiff was entitled to 'no judgment.' . . . [¶] This authority given the court could only be exercised when the fee . . . was to be allowed by an order made after final judgment, and the allowance is necessarily an incident to such judgment . . . ." (78 Cal. at p. 627.)

§ 1988),[20] "Section 1988 provides for awards of attorney's fees to a 'prevailing party.' Regardless of when attorney's fees are requested, the court's decision of entitlement to fees will therefore require an inquiry separate from the decision on the merits—an inquiry that cannot even commence until one party has 'prevailed.'" (*White* v. *New Hampshire Dept. of Empl. Sec.* (1982) 455 U.S. 445, 451 [71 L.Ed.2d 325, 331, 102 S.Ct. 1162, 1166].)[21]

The conclusion follows that the agreement here, which included no provision as to costs or statutory fees, did not deprive the trial court of jurisdiction to entertain either a cost bill or, under section 1021.5, a motion for fees.

Nor do facts surrounding the agreement suggest that the parties intended a waiver of costs and statutory fees. The aim of the agreement was "to settle plaintiffs' claim regarding the alleged improper allocations of ltf [local transportation fund] monies between 1974 and 1978, and any claims regarding the legality of ltf allocations made for fiscal year

---

[20]The Fees Act amended section 1988 to provide "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [Education Amendments of 1972], or title VI of the Civil Rights Act of 1964, the court, in its discretion may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the cost."

It is one of numerous federal statutes which, like section 1021.5, codify the private-attorney-general theory; it is also the one most frequently compared with section 1021.5. Both are deemed legislative responses to *Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240 [44 L.Ed.2d 141, 95 S.Ct. 1612], which held federal courts without jurisdiction, absent explicit statutory authority, to award attorney fees on a private-attorney-general theory. (See. Sen. Jud. Com. Rep. No. 94-1011, reprinted in 1976 U.S. Code Cong. & Admin. News, at pp. 5908-5912; *Review of Selected 1977 California Legislation* (1978) 9 Pacific L.J. 281, 365-367.)

[21]Indeed, the facts in *White* are close to those at hand. Following entry of a consent decree silent as to fees, plaintiffs moved for an award under section 1988. Defendants argued that the agreement impliedly had waived fees and moved to vacate the decree. The district court denied the motion to vacate and awarded fees. The First Circuit reversed, holding a fee request under section 1988 a motion to alter or amend judgment and hence governed by the 10-day limit of rule 59(e) of the Federal Rules of Civil Procedure (28 U.S.C.). (See *White* v. *N. H. Dept. of Emp. Sec.* (1st Cir. 1980) 629 F.2d 697.)

The high court reversed, holding a postjudgment fee request under section 1988 not a motion to alter the judgment because fees are not an element of the cause of action. "Unlike other judicial relief, the attorney's fees allowed under § 1988 are not compensation for the injury giving rise to an action. Their award is uniquely separable from the cause of action to be proved at trial." (*White, supra,* 455 U.S. at p. 452 [71 L.Ed.2d at p. 331, 102 S.Ct. at p. 1166].)

The majority came close to approving the position taken by the Eighth Circuit in *Obin* v. *Dist. No. 9, Intern. Ass'n, supra,* 651 F.2d 574, 582, that postjudgment fee motions under section 1988 raise a claim collateral to and independent from the merits. The *Obin* view was endorsed by Justice Blackmun in concurrence (455 U.S. at p. 457 [71 L.Ed.2d at p. 334, 102 S.Ct. at p. 1168]) and mirrors that taken by this court. (See, e.g., *People* v. *McKale* (1979) 25 Cal.3d 626, 639, fn. 5 [159 Cal.Rptr. 811, 602 P.2d 731].)

1979-1980." Neither costs nor fees are included in those claims. Indeed, defendants conceded at oral argument that neither costs nor fees were discussed during settlement negotiations. We decline to infer waiver from mere silence.

We are not indifferent, though, to defendants' concern that one settling a lawsuit may want to know his total liability in advance of settlement. While the preferred procedure is to reserve fee issues for judicial consideration and determination (*Anthony* v. *Superior Court, supra,* 59 Cal.App.3d at p. 772; see also, other cases cited in fn. 14, *ante*), we decline to rule, as plaintiffs urge, that fee matters may never be injected into negotiations on the merits without placing counsel in a position of inherent conflict. We thus join this view of the *White* court: "In considering whether to enter a negotiated settlement, a defendant may have good reason to demand to know his total liability from both damages and fees. Although such situations may raise difficult ethical issues for a plaintiff's attorney, we are reluctant to hold that no resolution is ever available to ethical counsel." (455 U.S. at p. 453, fn. 15 [71 L.Ed.2d at p. 332, 102 S.Ct. at p. 1167].)

II

We turn to the award itself, which defendants challenge on these grounds: that plaintiffs' attorneys were neither "parties" nor "successful" within the meaning of section 1021.5.

■ The first contention is that plaintiffs incurred no personal liability for the services of their attorneys, several of whom were employed by agencies funded primarily with public monies,[22] and that a fee award benefiting such agencies[23] would contravene section 1021.5 and public policy. Defendants note that section 1021.5 as originally introduced (Assem. Bill No. 1310) included the word "private," that the Assembly struck the word (2 Assem. J. (1977-1978 Reg. Sess.) p. 3471), and that the Senate thereafter reinserted it. (3 Sen. J. (1977-1978 Reg. Sess.) p. 5602.) They concede that firms supported from strictly charitable sources are properly deemed "private enforcement" but urge that groups like Legal Services of Northern California should be deemed "public entities" not benefited by the statute.

---

[22]Plaintiffs were represented by Daniel Siegel, Michael Bush, and Alan Lieberman of Legal Services of Northern California, Butte Regional Office; Roberta Ranstrom of Legal Services of Northern California, Executive Office; Martin Flam of California Rural Legal Assistance; Loren Mitchell of the Legal Aid Society of Sacramento County; and Laura Rosenthal, a private attorney.

[23]The supplemental declaration of Daniel Siegel, for instance, states that "all fees received for my hours will inure to my program, and not to my individual benefit."

The cited glimpse of legislative history is at best equivocal. Indeed, Legal Services of Northern California is established under the Legal Services Corporation, a *"private* nonmembership nonprofit corporation" (42 U.S.C. § 2996b(a) [italics added]) that has been held not an agency of the federal government. (*Spokane Cty. Legal Serv., Inc.* v. *Legal Serv. Corp.* (E.D.Wash. 1977) 433 F.Supp. 278, 280; see also 42 U.S.C. § 2996d(e)(1).)[24] Though the corporation is not allowed to accept fee-paying clients (*id.,* § 2996f(b)(1), Congress clearly intended that it be eligible for fees on the same basis as "private" practitioners.[25] Thus fee awards have been made both in favor of (see, e.g., *Tasby* v. *Estes* (N.D.Tex. 1976) 416 F.Supp. 644; *Card* v. *Dempsey* (E.D.Mich. 1978) 445 F.Supp. 942) and against the corporation (see, e.g., *Flora* v. *Moore* (N.D.Miss. 1978) 461 F.Supp. 1104).

Defendants concede that section 1021.5 codified the "private attorney general" attorney-fee doctrine and that the Legislature, when drafting the statute, drew heavily on "pre-*Alyeska* federal private attorney general authorities adverted to in *Serrano III . . . .*" (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 934 [154 Cal.Rptr. 503, 593 P.2d 200] [*Woodland Hills II*].) It is from those pre-*Alyeska* underpinnings that this court concluded in *Serrano III*—filed four days after section 1021.5 was signed into law—that awards were properly made to attorneys employed by "public interest" law firms. "Because the basic rationale underlying the 'private attorney general' theory which we here adopt seeks to encourage the presentation of meritorious constitutional claims affecting large numbers of people, and because in many cases the only attorneys equipped to present such claims are those in funded 'public interest' law firms, a denial of the benefits of the rule to such attorneys would be essentially inconsistent with the rule itself. (See generally Comment, *Awards of Attorney's Fees to Legal Aid Offices,* [1973] 87 Harv.L.Rev. 411.)" (20 Cal.3d at p. 48.)[26]

---

[24]The Western Center on Law and Poverty, awarded fees in *Serrano III, supra,* 20 Cal.3d 25, is similarly established.

[25]In *Alyeska, supra,* the court observed that "remarks made during the debates on this legislation [Legal Services Corporation Act] indicate that there was no intent to restrict the plaintiff's recovery of attorneys' fees in actions commenced by the Corporation or its recipient where under the circumstances other plaintiffs would be awarded such fees. 120 Cong. Rec. 15001 (1974) (Rep. Meeds); *id.,* at 15008 (Rep. Steiger); *id.,* at 24037 (Sen. Cranston); *id.,* at 24052 (Sen. Mondale); *id.,* at 24056 (Sen. Kennedy). Thus, if other plaintiffs might recover on the private-attorney-general theory, so might the Corporation." (421 U.S. at pp. 262-263, fn. 36 [44 L.Ed.2d at p. 156]; see also 45 C.F.R. § 1609.5(a).)

[26]It is established that awards are properly made to plaintiffs' attorneys rather than to plaintiffs themselves (*Serrano III, supra,* 20 Cal.3d at p. 47, fn. 21) and are not barred because they are payable to an agency that furnishes its services without charge to the client. (See, e.g., *County of Humboldt* v. *Swoap* (1975) 51 Cal.App.3d 442, 444-445 [124 Cal.Rptr. 510] and cases cited.)

Nonetheless, this court's holding in *Serrano III* was narrower than the reach of the statute. Fees were held properly awarded to litigants who vindicate important constitutional questions. Section 1021.5, contrastingly, permits an award " 'in any action which has resulted in the enforcement of *an important right affecting the public interest*' regardless of its source—constitutional, statutory or other." (*Woodland Hills, supra,* 23 Cal.3d at p. 925.)

The rationale of *Serrano III,* like that of federal decisions, transcends mere literal expression of legislative intent and speaks to the aims underlying the fee doctrine.[27] As explained in *Incarcerated Men of Allen County Jail* v. *Fair* (6th Cir. 1974) 507 F.2d 281: "The fact that Appellees' counsel was a legal services organization, partially supported by public funds, is irrelevant in determining whether an award is proper. . . . An attorney fees' award serves its purpose—to prevent worthy claimants from being silenced or stifled because of a lack of legal resources—whether it goes to private or 'public' counsel." (P. 286.) Whether we focus on enabling suits by those otherwise unable to pursue the litigation, or deterring misconduct, an award to lawyers who have vindicated an important interest achieves the desired result whether they worked for a private firm or a legal services organization. (*Oldham* v. *Ehrlich* (8th Cir. 1980) 617 F.2d 163, 169.)[28] Thus we rule it no barrier to a section

---

[27]"In the complex society in which we live it frequently occurs that citizens in great numbers and across a broad spectrum have interests in common. These, while of enormous significance to the society as a whole, do not involve the fortunes of a single individual to the extent necessary to encourage their private vindication in the courts. Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement, for various reasons the burden of enforcement is not always adequately carried by those offices and institutions, rendering some sort of private action imperative. Because the issues involved in such litigation are often extremely complex and their presentation time-consuming and costly, the availability of representation of such public interests by private attorneys acting *pro bono publico* is limited. Only through the appearance of 'public interest' law firms funded by public and foundation monies . . . has it been possible to secure representation on any large scale. The firms in question, however, are not funded to the extent necessary for the representation of all such deserving interests, and as a result many worthy causes of this nature are without adequate representation under present circumstances. One solution . . . is the award of substantial attorneys fees to those public-interest litigants and their attorneys (whether private attorneys acting *pro bono publico* or members of 'public interest' law firms) who are successful in such cases, to the end that support may be provided for the representation of interests of similar character in future litigation." (*Serrano III, supra,* 20 Cal.3d at p. 44.)

[28]Accord, *New York Gaslight Club, Inc.* v. *Carey* (1980) 447 U.S. 54, 70, footnote 9 [64 L.Ed.2d 723, 738, 100 S.Ct. 2024]; *Reynolds* v. *Coomey* (1st Cir. 1978) 567 F.2d 1166, 1167; *Torres* v. *Sachs* (2d Cir. 1976) 538 F.2d 10, 13; *Rodriguez* v. *Taylor* (3d Cir. 1977) 569 F.2d 1231, 1245; *Bills* v. *Hodges* (4th Cir. 1980) 628 F.2d 844, 847; *Hairston* v. *R & R Apartments* (7th Cir. 1975) 510 F.2d 1090, 1092-1093; *Leeds* v. *Watson* (9th Cir. 1980) 630 F.2d 674, 677.

1021.5 award that the attorneys involved are employed by publicly funded legal services organizations.[29]

■ Defendants also contend that the award was improper because plaintiffs were not "successful" within the meaning of section 1021.5. Citing *Bruno* v. *Bell* (1979) 91 Cal.App.3d 776 [154 Cal.Rptr. 435] they argue that the litigation neither created nor preserved an identifiable sum of money, but merely diverted public funds from one purpose to another. They also argue that summary judgment was granted in their favor.

None of those assertions appears dispositive of the issue, which here is the test to be applied in a settlement context to determine if a party has been "successful." Section 1021.5 does not require that the successful party create or preserve an identifiable money sum; rather it states that the benefit conferred may be "pecuniary or nonpecuniary." (See fn. 1, *ante*.)

Nor is *Bruno*, *supra*, from which the "mere diverted" idea derives, controlling. Plaintiff there succeeded in invalidating a statute that provided for allocations to counties of certain state revenues.[30] His "success" resulted in the loss of $2.5 million in county revenue. The Legislature responded by amending the statute to cure its infirmity and to restore the counties' allocations. The Court of Appeal characterized the result as "the negation of a policy determination [vested in the Legislature] as to where these funds should go." (91 Cal.App.3d at p. 787.) It found the award proper under no statute or theory and vacated it on other grounds as contrary to public policy.

The *Bruno* result bears little resemblance to that achieved here, where funds were diverted from street and road projects to the very purposes for which the Legislature designated the funds. Plaintiffs vindicated legislative intent and thus benefited not only those who are transit-dependent in Butte County but the citizenry as a whole. (See Pub. Util. Code, § 99220, subd. (c) [fn. 3, *ante*.].) The importance of a statutorily based right must be assessed in "relationship to the achievement of fundamental legislative goals." (*Woodland Hills, supra,* 23 Cal.3d at p. 936.)

---

[29]Defendants do not challenge any portion of the award that will accrue to the benefit of either California Rural Legal Assistance or the Legal Aid Society of Sacramento County (see fn. 22, *ante*); and, given our holding, we need not inquire into the funding bases of those organizations.

[30]Plaintiff's action resulted in the invalidation, on constitutional grounds, of section 104.10 of the Streets and Highways Code, which provided for distribution to counties of a percentage of the income derived by the state from real property purchased for highway purposes.

Nor is it dispositive that defendants' motion for partial summary judgment was, in part, resolved in their favor. While California authority on the subject is sparse, common sense dictates that the determination of success under section 1021.5 must depend on more than mere appearance. As we said in *Woodland Hills,* the trial court must "realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right . . . ." (*Id.,* at p. 938.)

The rule followed by most federal courts construing "prevailing party" under the Civil Rights Attorney's Fees Awards Act, is that the inquiry as to a party's success must be a pragmatic one that may range outside the merits of the underlying dispute. "It's initial focus might well be on establishing the precise factual/legal condition that the fee claimant has sought to change or affect . . . . With this condition taken as a benchmark, inquiry may then turn to whether as a quite practical matter the outcome, in whatever form it is realized, is one to which the plaintiff fee claimant's efforts contributed in a significant way, and which does involve an actual conferral of benefit or relief from burden when measured against the benchmark condition." (*Bonnes* v. *Long* (4th Cir. 1979) 599 F.2d 1316, 1319; *accord, Chicano Police Officer's Ass'n, supra,* 624 F.2d at p. 131; *Nadeau* v. *Helgemoe* (1st Cir. 1978) 581 F.2d 275, 278; *F & M Schaefer Corp.* v. *C. Schmidt & Sons, Inc.* (S.D.N.Y. 1979) 476 F.Supp. 203, 206-207.[31])

The critical fact is the impact of the action, not the manner of its resolution. If the impact has been the "enforcement of an important right affecting the public interest" and a consequent conferral of a "significant benefit on the general public or a large class of persons"[32] a section 1021.5 award is not barred because the case was won on a preliminary issue (*Woodland Hills, supra,* 23 Cal.3d at p. 938) or because it was settled before trial. (*Rich* v. *City of Benecia* (1979) 98 Cal.App.3d 428, 436.)[33] As Congress seems to have reasoned in enacting the Fees Act: "A 'prevailing party' should not be penalized for seeking an out of court settlement, thus helping to lessen docket congestion. Similarly, after a complaint is filed, a defendant might voluntarily cease the unlawful practice. A court should

[31]*Schaefer* succinctly phrased the applicable test: "The appropriate benchmarks in determining which party prevailed are (a) the situation immediately prior to the commencement of suit, and (b) the situation today, and the role, if any, played by the litigation in effecting any changes between the two." (476 F.Supp. at p. 206.)

[32]The benefit must of course transcend a litigant's personal interest. (*Marini, supra,* 99 Cal.App.3d at p. 838; *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 89-90 [144 Cal.Rptr. 71].)

[33]Federal authority is in accord. The Supreme Court stated in *Maher* v. *Gagne* (1980) 448 U.S. 122, 129 [65 L.Ed.2d 653, 661, 100 S.Ct. 2570]: "The fact that respondent prevailed through a settlement rather than through litigation does not weaken her claim to fees [under 42 U.S.C. § 1988]." (See also, Lipson, *Beyond Alyeska—Judicial Response to the Civil Rights Attorneys' Fees Act* (1978) 22 St. Louis U.L.J. 243, 260.)

still award fees even though it might conclude, as a matter of equity, that no formal relief . . . is needed." (House Jud. Com. Rep. No. 94-1558 (Sept. 15, 1976) at p. 7; see also Sen. Jud. Com. Rep. No. 94-1011 (June 29, 1976) at p. 5, reprinted in 1976 U.S. Code Cong. & Admin. News at p. 5908.)[34]

### III

Accordingly we evaluate the award here to determine whether plaintiffs in fact were "successful." Their litigation aim was to assure an adequate public transit system in Butte County. Just prior to commencement of the action, BCAG had found that no unmet transit needs existed in the county and had rejected the request of the Chico City Council to allocate Chico's share of TDA monies to a transit system there. No public transit system existed in Chico or Oroville or between the major urban areas of the county, and service for the handicapped was both limited and violative of applicable regulations. (See fn. 7, *ante.*) After the court issued its contingent order on November 1, 1979, Local Defendants agreed to implement a plan including intracity systems for Chico and Oroville, an intercity system for the county, and a program whereby the elderly and handicapped might utilize systems throughout the county. It follows that the result achieved was precisely that which plaintiffs sought.

The question becomes whether their action substantially contributed to that result or, as the trial court phrased it, "whether or not the local politicians would have done what they have done absent the lawsuit." The record is replete with evidence that BCAG dramatically changed its position after the filing of plaintiffs' action. At the time suit was filed the board of supervisors, which controlled a majority of seats on BCAG, took the position that added public transportation was not needed. Supervisor Winston was reported (p. 5 in the Chico News and Review (Mar. 22, 1979)) to have remarked at the March 21 BCAG meeting: "I've been objecting to these public transportation systems for so long that I'm almost worn down . . . but I hasten to add that I'm not worn down." Yet within two months he had introduced a resolution, which BCAG adopted, for a feasibility study of an intercity system. In June 1979, BCAG rescinded all

---

[34]Thus it is no bar to a fee award that plaintiffs have settled the matter by agreeing to dismiss the action, with prejudice, on performance of defendants' promises. Contractual fees should not be awarded under Civil Code section 1717 where plaintiffs voluntarily dismiss an action *without prejudice* before trial. (*International Industries, Inc.* v. *Olen* (1978) 21 Cal.3d 218 [145 Cal.Rptr. 691, 577 P.2d 1031].) That rule, however, is premised on the avoidance of pointless litigation and, thus, conservation of judicial resources (*id.* at p. 225), as well as statutory language providing that the prevailing party is "the party in whose favor final judgment is rendered."

prior allocations for road purposes; and six months later it agreed to institute the four systems. (See fn. 9, *ante.*) The News and Review also reported on March 22, 1979: "There's no doubt that the suit has put pressure on the County and cities. Until it's resolved, no SB 325 [TDA] funds other than those for public transportation can be spent, which means that several road projects are being held up." (At p. 5.)

Defendants urged that the change was a response to gas crises of 1978 and 1979 and consequent increases in fuel costs. Plaintiffs adduced evidence, however, that Butte was the only rural county in California to show heightened interest in public transit during the gas crises, that there were no gas-station lines in the county during those periods, and that in spring 1979 the supervisors voted against odd-even gas rationing.

Defendants also urged that the change in attitude reflected the fact that five new members were seated on BCAG in January 1979. Plaintiffs countered with testimony that only one of the five was "pro-transit" and that, in March 1979, the newly constituted BCAG rejected Chico's reasserted request for a transit system there.

We conclude that the trial court properly found that the litigation was demonstrably influential in BCAG's decision to institute the four transit systems and, hence, that plaintiffs were "successful parties" under section 1021.5. Since defendants challenge the findings in no other respect,[35] we affirm the orders granting costs and attorney fees. We remand to the trial court with directions to hear and determine plaintiffs' request for fees on appeal, filed in the Court of Appeal on April 16, 1981, in conformity with the views set forth in *Serrano* v. *Unruh* (1982) *ante,* page 621 [186 Cal.Rptr. 754, 652 P.2d 985].

Bird, C. J., Mosk, J., Broussard, J., and Reynoso, J., concurred.

**KAUS, J.**—I respectfully dissent.

I do not reach the issues discussed in parts II and III of the majority opinion since I disagree profoundly that under the particular circumstances of this case and the settlement agreement before us, it was proper to award plaintiffs fees or costs.

---

[35]We reiterate that the court also found, as required by section 1021.5, that the "action . . . resulted in the enforcement of an important right affecting the public interest . . .; that a significant benefit has been conferred on both a large class of persons and on the general public; [and] that the necessity and financial burden of private enforcement [were] such as to make this award of attorney's fees appropriate."

The question is not, as the majority states at the outset, whether an agreement silent as to costs and fees creates a bar to either a cost bill or a motion for fees pursuant to section 1021.5 of the Code of Civil Procedure. Possibly it does not, but that is not this case. Here both the original as well as the amended complaint included specific prayers for costs and attorney fees. The settlement agreement specifically recited: "Plaintiffs shall file with the Court a dismissal of LOCAL DEFENDANTS with prejudice, within one week of the date that the last new transit system has initiated service as defined in ¶10 below." As I understand it, nothing but the necessary delay in establishing the transit systems called for by the agreement prevented the immediate filing of the dismissal with prejudice—nor do plaintiffs claim otherwise. Can there be any question that once such a dismissal had been filed, it would have been curtains for any effort to trigger an encore in the form of fees and costs? (*Kronkright* v. *Gardner* (1973) 31 Cal.App.3d 214, 219 [107 Cal.Rptr. 270]; *Wouldridge* v. *Burns* (1968) 265 Cal.App.2d 82, 84-85 [71 Cal.Rptr. 394]; *Ghiringhelli* v. *Riboni* (1950) 95 Cal.App.2d 503, 506 [213 P.2d 17].) The result cannot be different just because plaintiffs went into court before the dismissal was filed, without in any way disavowing it or offering extrinsic evidence to alter its plain meaning.

Having no wish to burden posterity with a tedious dissent, I shall simply state that none of the authorities cited by plaintiffs is precisely in point, in that none involves a specific prayer for costs and fees in the complaint and a specific promise to dismiss that complaint with prejudice. Particularly inappropriate is the majority's heavy reliance on *Rappenecker* v. *Sea-Land Service Inc.* (1979) 93 Cal.App.3d 256 [155 Cal.Rptr. 516]. That case involved the propriety of allowing costs after the plaintiffs' acceptance of an offer pursuant to section 998 of the Code of Civil Procedure by defendant to allow judgment in a certain sum to be taken. Later plaintiffs filed cost bills which defendant sought to strike. The Court of Appeal quite properly held that there was nothing in the section 998 procedure which, if followed, leads to a judgment, that would negative the normal consequences of a judgment for the plaintiffs as far as costs were concerned. The obvious distinction between *Rappenecker* and this case needs no elaboration; a favorable judgment invites the filing of a cost bill; a dismissal with prejudice forbids it.

Richardson, J., concurred.