[No. E002071. Fourth Dist., Div. Two. Nov. 25, 1986.]

SAN BERNARDINO COMMUNITY HOSPITAL et al.,
Plaintiffs and Appellants, v.
LAWRENCE G. MEEKS, as Director, etc., et al.,
Defendants and Respondents;
NATIONAL MEDICAL ENTERPRISES,
Real Party in Interest and Respondent.

**COUNSEL**

Horvitz, Levy & Amerian, Ellis J. Horvitz, Stuart B. Esner, S. Thomas Todd, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Steven L. Mayer, Catherine M. Steane, Musick, Peeler & Garrett, William McD. Miller III, Carpenter, Higgins & Simonds, Daniel B. Higgins, Lindsey Hau-Downing and Isabelle Greene Brown for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Charlton G. Holland, Assistant Attorney General, Anne S. Pressman and Brian C. Kipnis, Deputy Attorneys General, for Defendants and Respondents.

Casson, Calligaro & Mutryn, Malcolm J. Harkins III, Claudia Silverman, Barry I. Landsberg and Seth E. Bloon for Real Party in Interest.

John M. Rager, City Attorney (Fontana), and Robert G. Koch, Jr., City Attorney (Rialto) as Amici Curiae on behalf of Defendants and Respondents and Real Party in Interest and Respondent.

## OPINION

**McDANIEL, J.**—After our decision in this case was filed, real party in interest National Medical Enterprises (NME) and respondents, Office of Statewide Health Planning and Development (OSHPD), each filed a motion for an order to show cause re: sanctions, contending that the appeal of appellants (Community and St. Bernardine's) was frivolous. We issued an order to show cause, set the matter for oral argument, and ordered the parties to file points and authorities on the subjects of the imposition of sanctions, and on this court's jurisdiction to award sanctions after its decision had become final. We also directed that all relevant factual contentions be supported by new declarations. Extensive briefs and numerous declarations and exhibits have been filed, the hearing concluded and the matter is now before us for decision.

Appellants contend: (1) this court has no jurisdiction to award sanctions; (2) their appeal was not "prosecuted for an improper motive" (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179]); and (3) their appeal was not "totally and completely without merit." (*Ibid.*)

### FACTUAL AND PROCEDURAL BACKGROUND

On May 22, 1985, Community and St. Bernardine's filed a joint notice of appeal.

On July 29, 1985, NME filed a motion to dismiss the appeal, or in the alternative, for expedited review and for an appeal bond. In support of its motions, NME argued that the appeal was frivolous and pursued only for the purpose of staying the implementation of NME's certificate of need (CON) to construct a hospital in Rialto. On this ground, NME also argued that Community and St. Bernardine's should be required to post a bond to

protect NME from any losses sustained during the appeal. We denied the motions. It was for this reason that NME, as part of its response to the appeal, did not seek sanctions for a frivolous appeal, its reasonable assumption being that our denial of the motion to dismiss was a signal on the frivolous appeal issue.

On October 16, 1985, the record on appeal was filed.

On November 8, 1985, Mr. Miller, appellate counsel for Community, asked counsel for NME and OSHPD to stipulate to an extension of time in which to file appellants' brief, "[d]ue to anticipated calendar commitments." The stipulation, signed by Mr. Miller, recited that the brief would be filed "no later than December *16, 1985*." (Italics added.)

On December *18,* 1985, Community and St. Bernardine's filed their joint opening brief. The text of the brief was only *13½* pages long, cited a total of *2* cases (and several statutes), and was signed only by Daniel B. Higgins, counsel for St. Bernardine's. NME filed a 47-page brief, and shortly afterwards, OSHPD filed a 40-page brief. Community and St. Bernardine's then filed a 6½-page joint reply brief. (In the current sanctions proceeding, each of the appellants have filed separate briefs, which, together, are almost *10* times longer than their opening brief on appeal. Community's antisanctions brief is 53 pages, and cites 48 cases, and St. Bernardine's antisanctions brief is 45½ pages, with 29 additional pages of supporting declarations, and cites 32 cases.)

On May 14, 1986, we filed our decision, affirming the trial court. We stated that "If NME had sought sanctions for a frivolous appeal, we would have seriously considered imposing them, for this is a patently frivolous appeal. . . . It was only because of the charitable nature of these two appellants that we declined to issue our own order to show cause re: frivolous appeal."

On June 13, 1986, the *30th* day after our decision was filed, NME filed a motion for an order to show cause re: sanctions. The sanctions sought were: costs, attorney's fees, damages incurred by NME as a result of the appeal, and an order enjoining appellants from constructing or planning any new beds or facility for 19 months (the duration of the litigation before the superior court and the appellate court).

On June 23, 1986, the *40th* day after our decision was filed, OSHPD filed a motion for an order to show cause re: sanctions, seeking to recover the funds it had spent in defending the appeal.

On June 24, 1986, appellants filed an opposition to NME's and OSHPD's motions. The opposition recites in relevant part that appellants "have decided not to pursue the matter further."

On July 2, 1986, we issued the order to show cause re: sanctions.

On July 16, 1986, we stayed the issuance of the remittitur for the purpose of resolving the foregoing order to show cause.

I

JURISDICTION

■ Without citing any relevant authority, Community and St. Bernardine's contend that NME's and OSHPD's motions for sanctions were untimely, because the motions were not *filed* within the 15-day period for seeking a rehearing. (Cal. Rules of Court, rule 27(b).) This contention is wholly without merit.

■ Unlike a petition for rehearing, a motion for sanctions, like a motion for attorney's fees, pertains to a matter which is *collateral* to the underlying litigation. (An order awarding sanctions "is appealable 'because it is a final order on a *collateral* matter directing the payment of money.'" (*I. J. Weinrot & Son, Inc.* v. *Jackson* (1985) 40 Cal.3d 327, 331 [220 Cal.Rptr. 103, 708 P.2d 682], italics added; see also *Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 634, fn. 3 [150 Cal.Rptr. 461, 586 P.2d 942].))

■ A motion for attorney's fees may be filed before a decision becomes final (see *Mack* v. *Younger* (1980) 27 Cal.3d 687 [165 Cal.Rptr. 876, 612 P.2d 966]; see also *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929], where the motion was filed on the *29th* day after the decision was filed (*id.,* at p. 777)), or before the remittitur has issued (see *Olson* v. *Hickman* (1972) 25 Cal.App.3d 920 [102 Cal.Rptr. 248]). ■ In *Olson,* less than 10 days before the remittitur was due to issue, the appellate court granted the appellant's request for a temporary stay, in order to consider his motion for attorney's fees. (Presumably the request had been filed after the decision was final as to the appellate court.) *Olson* was cited with approval by our Supreme Court in *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 932 [154 Cal.Rptr. 503, 593 P.2d 200]. Other post-*Olson* cases have characterized the attorney fee request in that case as made while the "appeal was pending, if only as to the attorney-fee issues." (*Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428, 434 [159 Cal.Rptr. 473].)

At oral argument here, Community contended that the rationale underlying the stay in *Olson* did not apply to this case, because *Olson* involved a special situation where the stay was requested because the applicable attorney fee statute (Gov. Code, § 800) had been enacted after the briefs had been filed. However, this distinction is irrelevant, because the statute was enacted on November 30, 1971, and became effective on March 4, 1972, *four days* after the court's decision had been filed (on Feb. 28, 1972). In other words, presumably, the petitioner could have filed his request in the remaining 26-day period before the court's decision became final on March 28, yet the court nevertheless permitted the filing after *its* decision had become final, but before the *appellate process* had become final.

In sum, because sanctions resemble attorney's fees in that both are collateral to the underlying litigation, there is no reason why a motion for sanctions may not be filed within the same time period as a motion for attorney's fees, i.e., before the remittitur has issued. In this case, both NME's and OSHPD's motions were filed well within that period. ██ ██ ██ ██ ██ Accordingly, the motions were timely.[1]

██ Again, without citing any relevant authority, Community and St. Bernardine's contend that we have no jurisdiction to *consider* the sanctions issue, because it is "obvious" that in order to award sanctions, we would have to modify our decision, and we lost the power to do so when the decision became final (Cal. Rules of Court, rule 24(a)). This contention is only partially correct. We no longer have the power to modify our decision, but we need not do so in order to award sanctions.

██ ██ This is so, because the analogous issue of attorney's fees may be considered "*after* the final disposition of the merits of an appeal." (*Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 166 [188 Cal.Rptr. 104, 655 P.2d 306], italics added.) In *Pacific,* the motion for fees was filed after the remittitur had issued. The following day the remittitur was recalled and the motion was filed. As to its jurisdiction to consider the motion, the court said that "the recall of the remittitur had the effect of reinstating the court's jurisdiction over the appeal, rendering disposition of the motion appropriate." (*Id.,* at p. 166.)

---

[1]*Community* contends, with regard to jurisdiction over the sanctions issue, that there is no distinction between *staying* a remittitur and *recalling* the remittitur, and that therefore the showing of fraud, mistake or inadvertence which is necessary in the recall cases is necessary here. We disagree. A reviewing court stays the remittitur to *retain* the jurisdiction it *has,* and recalls the remittitur to *regain* the jurisdiction it has *lost.* Witkin calls the former "[u]nusual" and the latter "extraordinary." (9 Witkin, Cal. Procedure (3d ed. 1985) § 602, p. 588, § 603, p. 589.) Webster's Third New International Dictionary (1961) defines extraordinary as (among other things): "exceptional *to a very marked extent: most* unusual: *far* from common . . . *very* outstanding . . . *very* remarkable . . . *rarely* equaled." (P. 807, italics added.)

At oral argument, Community contended that *Pacific* was limited to "those relatively rare instances in which the appeal is dismissed on motion of the appellant." (*Pacific Legal Foundation* v. *California Coastal Com., supra,* 33 Cal.3d 158, 166.) Not so. That statement was made in the context of, and in response to, the Coastal Commission's contention that the reviewing court had no jurisdiction to rule on the motion for attorney's fees, *because it had dismissed the appeal.* The Commission did not appear to dispute the proposition, quoted above, that the recall of the remittitur gave the court jurisdiction to dispose of the motion for attorney's fees after its decision had become final.

██ ██ An additional reason why a request for sanctions on appeal may be filed and ruled on after the decision has become final and before the remittitur has issued, is that the statutory right to sanctions is inextricably linked to the statutory right to costs,[2] and "costs 'are allowed solely as an incident of the judgment given upon the issues in the action . . . They constitute no part of a judgment at the moment of its rendition.'" (*Folsom* v. *Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 677 [186 Cal.Rptr. 589, 652 P.2d 437].)

Community and St. Bernardine's (appellants) do not dispute the fact that sanctions are an aspect of costs, or that costs are incidental to the judgment. They contend, nevertheless, that we have no jurisdiction to award sanctions, because sanctions resemble *discretionary* as opposed to *ordinary* costs,[3] and we have no jurisdiction to award discretionary costs after our decision has become final. However, this proposition as to our jurisdiction to award discretionary costs begs the question at issue, and, in any event, is disproved by the very authorities appellants offer in its support. First, appellants cite Witkin for the proposition that "A party who seeks the exercise of this discretion [of a reviewing court to grant or withhold costs] should make the request to the reviewing court *during the pendency of the appeal.*" (9 Witkin, Cal. Procedure (3d ed. 1985) § 669, p. 645, italics added.) ██ However, "when an appeal is taken the action remains pending (Code Civ. Proc.,

[2]Code of Civil Procedure section 907 recites: "When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the *costs* on appeal such damages as may be just." (Italics added.) Rule 26 of the California Rules of Court is entitled "*Costs on appeal,*" and recites in relevant part: "(a) [*Right to costs*] . . . Where the appeal is frivolous or taken solely for the purpose of delay . . . the reviewing court may impose upon offending attorneys or parties such penalties, *including the withholding or imposing of costs,* as the circumstances of the case and the discouragement of like conduct in the future may require." (Italics added.)

[3]This distinction is based on rule 26(a), which recites in relevant part: "Except as hereinafter provided, the prevailing party shall be entitled to his costs on appeal as incident to the judgment on appeal [ordinary costs] . . . In any case where the interests of justice require it, the reviewing court may make any award or apportionment of costs which it deems proper [discretionary costs]."

§ 1049)[4] . . . until the appeal is disposed of *by the filing of the remittitur from the appellate court.*" (*People* v. *Superior Court* (1956) 145 Cal.App.2d 683, 687 [303 P.2d 628], italics added.)

■ Next, two cases cited by Witkin for the foregoing proposition, and cited by appellants for its converse, clearly state that a reviewing court has jurisdiction to make a discretionary award of costs before the remittitur has issued. Both cases involved the question of whether to recall the remittitur to change an award of costs to the prevailing party (ordinary costs), to an award of costs to the losing party (discretionary costs), because of some unique feature of the case which the reviewing court had allegedly failed to take into account. In both cases the reviewing court said that the issue should have been raised *before the remittitur had issued.*

In the earlier case, *Paine* v. *Bank of Ceres* (1943) 60 Cal.App.2d 621 [141 P.2d 219], the court said: "Normally . . . the prevailing party is entitled to his costs on appeal as of course. If the losing party wants to urge that the appellate court should exercise its inherent power and deny costs to the prevailing party in the interests of justice he should normally urge such point before the appellate court has lost jurisdiction *by the issuance of the remittitur.*" (*Id.,* at p. 623, italics added.) (The foregoing quotation was cited with approval by the California Supreme Court in *In re McGee* (1951) 37 Cal.2d 6, 10 [229 P.2d 780], another recall case relied on by appellants.) In the later case, *Lavine* v. *Jessup* (1959) 175 Cal.App.2d 136 [345 P.2d 505], the court said: "Obviously, the exercise by a reviewing court of discretion to order such an apportionment [of costs] assumes the existence of jurisdiction to do so; and that jurisdiction is lost *by the issuance of the remittitur.*" (*Id.,* at p. 138, italics added.)

In view of all the above, we hold that we have jurisdiction to consider NME's and OSHPD's motions for sanctions, and we shall proceed to the merits of such motions.

II

WAS THE APPEAL FRIVOLOUS?

■ "[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any rea-

---

[4]Code of Civil Procedure section 1049 recites in relevant part: "An action is deemed to be pending from the time of its commencement until its *final determination on appeal.* . . ." (Italics added.)

sonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty, supra,* 31 Cal.3d 637, 650.) "The two standards are often used together, with one providing evidence of the other. Thus, the total lack of merit of an appeal is viewed as evidence that appellant must have intended it only for delay." (*Id.,* at p. 649.) "[A] factor contributing to our . . . conclusion that the . . . appeal [in this case] was vexatious, frivolous and a sham, was the slipshod and inarticulate nature of . . . the brief on appeal." (*Custom Craft Carpets, Inc.* v. *Miller* (1982) 137 Cal.App.3d 120, 122 [187 Cal.Rptr. 78].) "All of the matters which present counsel [in the sanctions proceeding] now urges relating to the merits of this litigation, could and should have been raised [previously]." (*Id.,* at p. 123.)

Applying the foregoing standards to the case here, we consider separately the new factual material submitted by both Community and St. Bernardine's.

### A. *Community*

The frivolous issue is addressed in a 5½-page declaration of Ray H. Barton, III (Barton), Community's administrator and chief executive officer since late 1982, and in a 17½-page declaration by William McD. Miller III (Miller), counsel for Community in the evidentiary part of the administrative proceedings and on appeal.

Barton states: (1) he authorized the appeal because Musick, Peeler & Garrett (Musick) advised him there were "reasonable grounds" therefor, and because he and Musick thought the administrative decision was unfair to Community; (2) he believed, and Musick confirmed, that Community's prospects for success at a new administrative hearing would be "substantially improved"; (3) NME's proposed facility would "siphon off the private-pay patient base which historically had kept Community hospital financially viable"; (4) his and Community's motives in pursuing the appeal were "never to delay"; (5) he believed that there was "at least an even probability" that the CON-suspension legislation would never take effect; and (6) Community's present plans are to build an ambulatory care center on its Fontana cite, "if it can lawfully do so."

Miller states: (1) he was and is convinced that the administrative law judge's (ALJ) decision was unauthorized; (2) the relevant CON statutes had never been construed in any reported opinion; (3) he believed a new hearing was "reasonably likely to result in a more favorable decision"; (4) until "a few months ago," (i.e., early 1986) Musick had been advising its hospital clients that "there was no assurance" that a CON would not be required after January 1, 1987; (5) his statement to this court at oral argument that

the impact of OSHPD's decision was to reserve "in perpetuity" 44 beds for NME (a statement which we characterized in our opinion as coming "perilously close to professional misconduct") was "admittedly . . . a poor choice of words . . . inaccurate . . . [and] inartfully . . . express[ed]," but was "not an attempt to mislead the court"; (5) our denial of NME's motion to dismiss the appeal on the ground that it was frivolous, and our denial of NME's motion that appellants be required to post a bond, "reinforced [his] belief that the appeal raised legitimate issues"; (6) he "attempted to process [the] appeal quickly . . . and filed [the] briefs without seeking extensions of time . . . [he] had no desire to delay [and Community] had expressly instructed that there be no unnecessary delay"; and (7) NME cannot have been prejudiced by the appeal, because its failure to submit any plans or specifications to OSHPD shows that it (NME) does not intend to build a facility in Rialto.

However, all the foregoing could well be characterized as being too little and too late. Moreover, much of it is contradicted by NME's and OSHPD's evidence (which they have presented in a joint appendix, hereinafter referred to as the appendix). More specifically as to the *merits* of Community's appeal, Miller's vigorous effort to persuade us *now* that the ALJ's decision was unauthorized and the permanence of CON-suspension legislation was uncertain should have been made in his (or his colleague's) opening brief, where there was *no* reference whatsoever to the forthcoming suspension, and every effort was made to persuade us to the contrary. Significantly, except for a brief reference to the failure to discuss the prejudice issue, Miller does not refer to Community's opening brief, or make any attempt to explain its deficiencies.

· As to Community's *motive* for the appeal, the appendix includes a declaration by H. Dean Madison (Madison), OSHPD's deputy director of the Division of Health Planning and Review, and the supervisor of the CON program. The declaration recites: (1) about a week after our decision in this case, in a telephone conversation between Madison and Musick partner J. Robert Lipset on an unrelated matter, Madison referred to the fact that NME and OSHPD had prevailed in this appeal, and Lipset responded: "'Well, our client [Community] got what it wanted, it doesn't matter,' or words to that effect"; (2) *after* NME was granted a CON, if appellants were "serious about pursuing their projects," they could have refiled their applications under Health and Safety Code section 437.12, which permits the director of OSHPD to grant a CON if any *one* of the criteria in the section is met, even if the need for beds is less than that requested. Appellants "arguably" would have qualified for director's discretion under sections (a)(3) (community support for services, which have been provided for at least five

years), and (a)(5) (delivery of services in an "innovative and more competitive manner, or at a lower cost than . . . other facilities in the area.")[5]

Further, the credibility of Barton's and Miller's foregoing beliefs about the uncertainty of the CON suspension is undermined by a report of Community's accountants in the appendix, which report recites in relevant part: "DEFERRED FACILITIES DEVELOPMENT COSTS . . . in the event [this] appeal is unsuccessful, [Community] intends to commence construction [in Fontana] after the expiration of the Certificate of Need law (December 31, 1986.)" The report was dated *October 8, 1985,* over two months before appellants' opening brief was filed.

On the delay issue, Miller stated, as noted, that he "filed [the] briefs without seeking extensions of time" (i.e., from *this court).* However, the appendix contains Musick's request to *NME and OSHPD* to stipulate to a 30-day extension to file the appellants' opening brief "[d]ue to [Miller's] anticipated calendar commitments." The brief was signed by St. Bernardine's attorney, and not by Miller, and was filed 30 days after the California Rules of Court rule 17(a) deadline.

Finally, as to Miller's statement (No. 7, *ante,* p. 467) that NME has not yet submitted any plans or specifications to OSHPD (i.e., is not serious about implementing its CON), the appendix includes a declaration of Harris F. Koenig, NME's field vice-president, acquisition and development. The declaration recites in relevant part: "In order to obtain State . . . architectural approval [for NME's project], NME would have to spend approximately $1.2 million, for preparation of architectural drawings and other requisite documents . . . . NME could not incur these costs until the appeal process was completed because the costs were both substantial and non-recoverable . . . in the event that the project was not constructed."

## B. *St. Bernardine's*

St. Bernardine's contends that the appeal was not frivolous, because "appellants reasonably believed" that the ALJ's 162/118-bed decision was illegal, unfair, and without evidentiary support. However, neither in its argument nor in the five declarations in support thereof, does St. Bernardine's address the following:

---

[5]Miller refers to Health and Safety Code section 437.12 in his declaration, but seems to indicate that reversal of the grant of the CON to NME and a new hearing would be required to invoke its provisions. However, according to Madison, appellants could qualify under this section despite the grant of the CON to NME.

(1) It agreed at the administrative hearings to scale down its project (i.e., without further hearings on the smaller project) if it were successful;[6]

(2) It requested the trial court to order OSHPD to recalculate the point totals on the basis of criteria which would result in St. Bernardine's ranking first, and *only in the event that such request were refused,* to order further hearings to allow the applicants to meet the lower-bed need.

Three of St. Bernardine's declarants (Matthews, *ante,* Daniel B. Higgins (Higgins), its appellate attorney, *ante,* and Harold C. Harris, Jr., chairman of its board), state that the appeal was not taken for the purpose of delaying NME's project. However, Higgins does not explain why an attorney who did not want to delay a competitor's project, and who, according to his (Higgins's) declaration, has been "extensively involved in representing health care clients with respect to virtually every type of certificate of need matter," and was "familiar with substantially all of the major certificate of need proceedings which have occurred in the State of California . . . and with the policies and personnel of [OSHPD]," would have taken over 2 months to write a 13½-page appellate brief on *one* CON issue, and would not have chosen the less time-consuming, less costly, and less risky route of refiling his client's application pursuant to Health and Safety Code section 437.12 (see *ante*). Significantly, Higgins's declaration recites: "I considered . . . that a reversal on the merits would provide St. Bernardine with its only opportunity to advocate its project *on a comparative basis.*" (Italics added.) However, according to Madison, *ante,* reversal was *not* necessary in order to provide St. Bernardine's with an opportunity to advocate its project on a *noncomparative* basis pursuant to Health and Safety Code section 437.12.

The foregoing declarants' statements that St. Bernardine's did not appeal to delay NME's project is also undermined by appellant's *joint* effort on appeal, by their inadequate opening brief, and by a five-page letter in the appendix from Higgins to William E. Barnaby, a lobbyist for the California Association of Catholic Hospitals. The letter is dated January 20, 1984, during the administrative proceedings in this case, and recites in relevant part that Higgins's office represented "three Catholic hospital systems in California which are attempting to resist major new hospital developments by *for profit chains.* The cases involve a new hospital proposed by *NME* in

---

[6]The foregoing agreement undermines the credibility of that part of Robert L. Matthews's (St. Bernardine's associate administrator's) declaration which states: "The [ALJ's] decision [as to the 162/118 beds] came as a complete surprise to those members of the St. Bernardine staff [involved in the hearing]. . . . We believed that each of the competing applicants should have been given an opportunity to present and have considered a scaled-down project similar to the one being approved for NME. It struck us as unfair to allow NME to construct a much smaller facility than that which was originally proposed."

Rialto which is opposed by St. Bernardine. . . ." (Italics added.) No mention is made of Community's proposal, although, as noted, the administrative hearings were in progress as to all *three* proposals.

Finally, St. Bernardine's contends that sanctions should not be awarded because its conduct is not "reprehensible," but represents merely the "unsuccessful attempt of a charitable, religious institution to expand a hospital." Suffice it to say that the conduct of *any* hospital institution, charitable, religious or otherwise, which spends large amounts of *hospital* funds to intentionally or otherwise delay a *competitor's* delivery of *hospital* services to an area which lacks them (see the amici briefs of the Cities of Fontana and Rialto), is neither charitable, religious, nor nonreprehensible.

■ Having put the worst face on what happened, the panel is yet of the view that sanctions should not be imposed for having taken a frivolous appeal. Under the *Flaherty* criteria, even though an appeal can be justified on arguably legal grounds, it can yet be the occasion for the imposition of sanctions if undertaken solely for purposes of delay (Code Civ. Proc., § 907). It was this aspect of the matter which led the author of the opinion to make the observation on this subject in the "DISPOSITION" portion of the opinion in this case filed May 14, 1986.

Although we cannot point to any precise authority for the proposition (see fn. 7, *post*), as a matter of informal policy, in this division, we have uniformly declined to impose sanctions unless the panel were unanimous in favoring them. Such policy is susceptible of articulation into a rule stated in terms of the burden of proof.

In other words, because of the disciplinary flavor of the proceedings and the punitive nature of any decision to award sanctions, we view it as well advised to require proof of an intent to delay by *clear and convincing evidence,* well beyond a mere preponderance and approaching the criminal standard of *beyond a reasonable doubt.*[7]

---

[7]In *Hersch* v. *Citizens Savings & Loan Assn.* (1983) 146 Cal.App.3d 1002 [194 Cal.Rptr. 628], the court imposed sanctions of $125,000 on appellants where it found that the appeal was taken solely for purposes of delay. In discussing the evidence it relied upon in reaching its decision to impose sanctions, the *Hersch* court stated that "the evidence is persuasive." (*Id.,* at p. 1012.) To demonstrate what it was that was "persuasive" the court went on to recite, "[d]efendants argue loudly that the appeal taken was based upon valid and arguable legal grounds and thus cannot be held to be frivolous. We disagree. (Fn. omitted.) Defendants support their argument with declarations of reputable legal scholars. Tested by this theory, however, it would virtually never be possible to hold an appeal frivolous. Every legal concept, even the most cherished and long observed, is subject to scrutiny, and even challenge, under proper circumstances. Code of Civil Procedure section 907 therefore must be read as requiring an inquiry into the *motive* of an appellant for prosecuting his appeal, as opposed to an evaluation of his relative chance for success therein. Furthermore, no determination of

Having stated the foregoing proposition, we must at once concede that such subjective standard defies precise definition. However, it is true nevertheless that it affords one of those situations where it can be said "I cannot describe it, but I will know it when I see it."

The facts here present a case where we cannot see "it." The three members of the panel have three different reactions to the facts. One member is absolutely convinced that the appeal was taken solely for delay. One member of the panel is equally convinced that the appeal was not taken solely for delay. The third member remains uncertain. Thus, if the foregoing rule is to be applied, the mere circumstance of this diversity of views among the panel necessarily demonstrates that the evidence on the side of "solely for delay" is *not* clear and convincing.

To recite certain of the positions Community has taken on the issue, one of its spokesmen declared that it did not refile its CON application under the "director's discretion" statute, because Lutheran Hospital Society was willing to finance Community's project only if NME did not obtain a CON. Lutheran's position on this was based in turn on its belief that the "western communities" could support only one new hospital.

As for the statement attributed to Mr. Liset, i.e., that Community "got what it wanted" out of the appeal, he declared, "The correct interpretation of my comment is that for financial reasons unrelated to the appeal, [Community] 'got what it wanted,' i.e., it did not appear likely that NME would construct Inland Communities Hospital."

To recite certain positions St. Bernardine's has taken on the issue, one of its spokesmen declared that St. Bernardine's did not refile its CON

---

frivolousness is necessary when it is found that the purpose of appeal was *delay*. Delay, as a motive, is specifically addressed and made sanctionable by the statute. Defendants' motive in this case is as easy to understand as it is difficult to hide. For nearly five years defendants have had the use of approximately $1 million legally owed by them to plaintiffs. It is common knowledge that a conservative investment during this same period would have earned annual interest greatly in excess of the 7 percent, and later 10 percent, payable upon civil judgments. In this type of market good investment counsel could not ignore the fact that postponement of payment of this judgment was a profitable venture. Given the legal education and investment sophistication of defendants in this case, and their indisposition ever to post the collateral called for in their agreement with plaintiffs, we are compelled to the conclusion that material gain through delay was and is their motive." (*Hersch* v. *Citizens Savings & Loan Assn.*, *supra*, 146 Cal.App.3d 1002, 1012, original italics.) This scenario in our view falls surely into the "clear and convincing" category we have fashioned. Similarly, the court in *In re Marriage of Stich* (1985) 169 Cal.App.3d 64 [214 Cal.Rptr. 919], which imposed sanctions because the appeal was taken solely for delay (Code Civ. Proc., § 907), characterized the evidence upon which it relied in reaching its decision as "clearly" disclosing such a motive. (*Id.*, at p. 78.) Again, the court's recitations of what the appellant did to delay the inevitable could readily be described as "clear and convincing."

application under the "director's discretion" statute because St. Bernardine's believed that to build beds in addition to NME's would be "financially improvident."

Otherwise, St. Bernardine's expressed willingness to reduce the size of its project, if the ALJ found that fewer beds were needed than it had applied for. Moreover, St. Bernardine's argues that it never agreed that the ALJ could issue a CON for more beds than those presently needed, or condition future installation of these presently unneeded beds on approval by OSHPD rendered without a new CON proceeding.

Finally, St. Bernardine's urges that its contention on appeal that the ALJ could not award a CON for a scaled-down NME project without holding a comparative hearing is not inconsistent with St. Bernardine's willingness to accept a scaled-down CON at the end of the administrative hearing. This, it contends, is because St. Bernardine's proposed at the outset of the administrative hearing that the proceeding be bifurcated, with a determination of bed need preceding a comparative analysis of the competing projects. Thus, the argument continues, St. Bernardine's cannot now be faulted for expressing the desire to benefit from a procedure which it had previously challenged as unfair and unsuccessfully urged the ALJ not to adopt. Finally it argues that its willingness to reduce the scope of its project did not waive the position, which it consistently took throughout the proceeding, that bed need should have been determined before the projects were evaluated.

In sum, in light of these representations, among others, and notwithstanding the "worst face" scenario recounted earlier, we hold that there is not clear and convincing evidence that the appeal here was taken solely for delay and, noting further, that there was at least one legal issue which could fairly be characterized as arguable on appeal.

III

Turning to another aspect of this postopinion proceeding, we have learned something from it. With the benefit of hindsight, we can see now that it would have greatly facilitated the court's factfinding process if, in connection with issuance of the order to show cause, we had also appointed a referee to take evidence on the "solely-for-delay" issue and then to make a finding on that issue. Reviewing a record developed before such a referee would have enabled the panel to proceed with a greater sense of confidence of

where the truth lay. In other words, such a procedure would have been better than our having to resolve the factual issue only from declarations where credibility and other so-called testimonial qualifications of the declarants were crucial.

ORDER

The motions of respondent and of real party in interest are denied.

Rickles, Acting P. J., and Kaufman, J., concurred.

The petition of real party in interest and respondent for review by the Supreme Court was denied March 4, 1987.