Filed 5/29/13  Birke v. Oakwood Worldwide CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MELINDA BIRKE, a minor, etc., | B234296 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. LC075094) |
| OAKWOOD WORLDWIDE et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County.  Louis Meisinger, Judge.  Affirmed.

Law Office of Michael R. Sohigian, Michael R. Sohigian and Johnny Birke for Plaintiff and Appellant Melinda Birke.

Kinsella Weitzman Iser Kump & Aldisert, Dale F. Kinsella, Gregory P. Korn and Amber H. Melius for Defendants and Respondents.

_____

## INTRODUCTION

Melinda Birke (Birke), through her father and guardian ad litem John Birke, filed suit against Oakwood Worldwide (Oakwood) alleging a nuisance cause of action arising out of the failure of Oakwood to limit secondhand smoke in the outdoor common areas of the residential apartment complex where the Birke family resided. In a prior opinion, we reversed the trial court's order sustaining Oakwood's demurrer to the nuisance cause of action alleged in Birke's first amended complaint without leave to amend. (*Birke v. Oakwood* (2009) 169 Cal.App.4th 1540 (*Birke I*).)

As Birke's first appeal was from the trial court's ruling on demurrer, we accepted the factual allegations of the operative complaint as true. "Whether or not her claims can survive a properly supported summary judgment motion, let alone prevail following a trial," we found Birke had stated a cause of action for public nuisance sufficient to withstand demurrer. (*Birke I, supra,* 169 Cal.App.4th at p. 1543.) "To be sure," we noted, "Birke may not be able to prove the seriousness of the harm she has alleged or establish the harm outweighs the social utility of Oakwood's conduct." (*Id.* at p. 1551, citation omitted.) Indeed, following a bench trial, the trial court concluded that she had failed to meet her burden of proof and entered judgment in Oakwood's favor. Thereafter, the trial court denied Birke's motion for attorney fees pursuant to Code of Civil Procedure section 1021.5. Birke appeals from the judgment as well as the order denying her request for attorney fees. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

"Oakwood manages and operates numerous apartment complexes including the Oakwood Apartments in Woodland Hills, California, where Birke and her parents resided. Oakwood has had a long-standing policy prohibiting smoking in all indoor units and indoor common areas but permits smoking in the outdoor common areas to accommodate tenants and guests who smoke. Oakwood declined previous requests of the father John Birke to ban smoking in the outdoor common areas." (*Birke I, supra,* 169 Cal.App.4th at p. 1543.)

2

At the time Birke, through her guardian ad litem, filed her original complaint against Oakwood in 2006, she was five years old and living with her parents at the Oakwood complex in Woodland Hills.[1]  She alleged "Oakwood 'allowed, encouraged and approved a toxic, noxious, hazardous, offensive—and in fact carcinogenic—condition to be present in all of the outdoor common areas of the complex' including near the swimming pools, common barbeque areas, playground areas, and outdoor dining areas. The complaint asserted that secondhand smoke was 'harmful to health,' 'indecent and offensive to the senses,' and 'obstructed the free use of the property, so as to interfere with the comfortable enjoyment of life or property by residents of [Oakwood].'  The complaint also cited California Air Resources Board (CARB) and United States Surgeon General findings that secondhand smoke is 'an airborne toxic substance that may cause and/or contribute to death or serious illness,' 'there is no risk-free level of exposure to secondhand smoke,' and that nonsmokers have increased risks of heart disease and lung cancer when exposed to secondhand smoke.  The complaint did not allege that the general public suffered from respiratory distress; rather, it alleged the general public suffers an increased risk of *heart disease* and *lung cancer* and those are different in kind from the aggravation of allergies and asthmatic symptoms that Birke suffered from." (*Birke I, supra,* 169 Cal.App.4th at p. 1544, original italics.)

In response to Oakwood's original demurrer, Birke filed a first amended complaint, repleading her public nuisance cause of action, but also asserting the conditions at Oakwood constituted a "private nuisance," stating:  "'Also, the nuisance conditions Defendants created, allowed, encouraged and approved constitute a private nuisance, because they substantially interfered as alleged with Melinda's enjoyment of land she occupied.'" (*Birke I, supra,* 169 Cal.App.4th at p. 1545.)  She also added several additional Oakwood-related entities as defendants.  (*Ibid.*)  The allegations were

---

[1]     Birke's mother replaced her father as guardian ad litem; Birke's father acted as co-counsel in the case at trial.

virtually identical to the original complaint, with the addition of an allegation that a private security guard for Oakwood smoked a cigarette in the pool area on one occasion. (*Ibid.*)

"The allegations of the first amended complaint also included statements that the California primary outdoor air regulatory agency and the highest public health officer in the United States had found secondhand smoke to be a toxin and carcinogen that increases the risk of lung cancer and heart disease at any amount of exposure, and that a growing number of California cities such as Calabasas, Santa Monica and Dublin now prohibit smoking in outdoor public areas as a public nuisance. The complaint alleged that the effect of secondhand smoke on Birke's asthma, which led to three bouts of pneumonia, was a noxious, hazardous and offensive condition which would offend, annoy or disturb an ordinary reasonable person.

"The complaint further alleged secondhand smoke in the outdoor common areas interfered with the rights of a substantial community of persons and caused her a different kind of injury, i.e., aggravation of asthma and allergies, than it caused the community (i.e., heightened risk of heart disease and lung cancer); and that the conditions created by Oakwood in the outdoor common areas interfered with the use and enjoyment of those areas by Birke and others. Also, it was alleged that Oakwood's refusal to abate the nuisance was 'demonstrably malicious and oppressive, and in frank disregard of the rights and safety of others, and warrant[ed] imposing against Defendants punitive damages, to punish and make examples of Defendants and to deter them and others from similar future acts.'" (*Birke I, supra,* 169 Cal.App.4th at p. 1545.)

After we reversed the trial court's order (Hon. Richard B. Wolfe) sustaining Oakwood's demurrer to Birke's nuisance cause of action and remanded for further proceedings, Birke and Oakwood filed motions for summary judgment. Both motions were denied.

4

Then, in February 2011, the matter proceeded to a six-day bench trial.[2]  Birke (then 10) continued to live at the Oakwood Apartments with her parents.[3]

As a preliminary matter, the trial court addressed Birke's requests for judicial notice of the CARB Staff Report and the January 2006 and December 2010 Surgeon General Reports referenced in the first amended complaint as well as ordinances in other California cities (Calabasas, Santa Monica and Dublin) prohibiting smoking in outdoor areas.  The court took judicial notice "of the *existence* and *content* of these ordinances and reports," but declined Birke's request to also judicially notice "*and accept as true* the factual findings of the various city councils adopting these ordinances and of the agencies issuing the reports."  (Original italics.)

As set forth in the trial court's statement of decision, the following evidence was presented at trial:  The Oakwood apartment complex where Birke lived with her parents is "situated on twenty acres and comprises thirteen separate apartment buildings.  Among its amenities, the property has a main pool, two 'satellite' pools, a hydromassage, six tennis courts, a full-size basketball court, a sandbox equipped with children's equipment, and a barbeque area.  Dining areas are situated adjacent to many of these facilities and also near the rental office/activities center.  Concrete walkways traverse the grounds and grassy areas are located throughout.

"At any given time, as many as 1,200 to 1,800 tenants (including approximately 150 children) occupy apartments at [Oakwood], and, throughout the year, as many as 6,000 due to the number of short-term residents.

---

[2]     Following the death of Judge Wolfe in August 2010, the matter was reassigned to the Hon. Louis Meisinger.

[3]     According to her opening brief, in August 2012, Oakwood evicted the Birke family after prevailing in an unlawful detainer action for forfeiture of their lease on the grounds Birke's father created a nuisance and engaged in unlawful conduct against smokers at the main pool on June 10, 2010 and July 23, 2011, and the Birkes' appeal in that case is pending.

"From at least the year 2000 through 2009, the Birkes have signed written leases for their apartment. (Exhibits 1001-1011.) As addenda, the leases include House Rules (Exhibit 3) which in relevant part provide:

"'*Smoking*: In order to make our environment healthier and safer for all residents and employees, no smoking is permitted in the clubhouse lobby, conference rooms, party room, TV theatre, gyms, restrooms, elevators, hallways, stairwells, or any other enclosed area. Smoking is permissible only inside apartments or in outdoor common areas.'

"Each lease (Paragraph 5(c)) incorporates the House Rules, and tenants agree they 'shall comply with each of such rules.' (*See e.g.,* Exhibit 1011 at p. 2.) The Birkes acknowledged reading the House Rules and agreeing to comply with them. (Exh. X, No. 2.)

"In substance, the House Rules forbid smoking in [Oakwood's] indoor common areas but permit it in the outdoor common areas. This policy is consistent with California and local law. Oakwood places ashtrays at various locations in the outdoor common areas (e.g., five around the main pool, two at each of the satellite pools, and two near the hydromassage.)[] For four months in 2008 (February and June through August), [Oakwood] distributed to tenants a newsletter stating 'You have a right to smoke.' (Exhibits 127-129, 141.)[]

"Before [Birke] was born and began using the outdoor common areas, her parents did not complain about Oakwood's policy of permitting smoking in these areas. [Birke's] father's] concern since then stems from his belief [Birke] suffers from asthma and is particularly sensitive to [secondhand smoke (SHS)]. The parties stipulated that [Birke] has been diagnosed by a medical doctor as having asthma and has been prescribed a home nebulizer and Albuterol. . . .[4]

---

[4]    The trial court noted: "Oakwood agrees [Birke] was *diagnosed* with asthma but denies there is sufficient evidence she actually suffers from that condition. Her treating physician had no recollection that he or his partner made such a diagnosis. If a competent doctor diagnosed [Birke] as having asthma, as Oakwood stipulated, that is

6

"With the exception of the tennis courts and grassy areas, the Birkes have occasionally observed smokers at each of the outdoor common areas, including smokers standing or dangling their feet in the main pool and the satellite pool near [Birke's] residence. [Birke] introduced photographs (Exhibit 140) showing as many as eight to twelve simultaneous smokers around the main pool in close proximity to a child or to children.[5] Since summer 2003, to protect [Birke] from exposure to outdoor SHS, the Birkes have, on occasion, removed [Birke] from certain of the outdoor common areas (main pool, satellite pool, hydromassage, sandbox, and dining area), avoided using them (main pool, satellite pool and hydromassage), or moved to another part of the same facility (main pool). During summer months, as many as 250 people may congregate in and around the main pool, and, on a typical summer weekend day, as many as 100 people may use the main pool at a given time.

"Since 2003, Oakwood has declined requests by the Birkes and at least one other tenant to prohibit or limit smoking in the outdoor common areas.[6] The Court judicially

---

proof she does. Whether [her] asthma has been exacerbated by exposure to outdoor SHS is another matter. The [first amended complaint] also alleged that [Birke] suffered from chronic allergies which were aggravated by her exposure to environmental SHS. [She] proffered no evidence to substantiate either of these allegations."

5      "No photographs show [Birke] near these smokers, and the children who are depicted likely belong to the smokers themselves since the pictures include children's paraphernalia."

6      "[Birke] sought to admit in evidence an anonymous letter dated June 27, 2006, purporting to be from an [Oakwood] tenant, urging Oakwood to restrict smoking. (Ex. 149.) The letter was admittedly received by Oakwood but was not otherwise authenticated. On that ground alone, it was properly excluded both as evidence of 'notice' and for its truth (if offered for that purpose). Oakwood did not respond to the letter, but the adoptive admission exception to hearsay (silence as acquiescence) would not allow its admission. Oakwood would not be obliged to respond to a letter from one of thousands of its *actual* tenants concerning the alleged dangers of SHS much less to an anonymous letter writer to an unknown reply address. (*Simpson v. Bergmann* (1932) 125 Cal.App. 1, 8.)"

knows that at least nine California cities have enacted laws prohibiting or regulating smoking in outdoor areas within city limits. (Six cities have done so since this lawsuit was filed in June 2006.) The Court also takes judicial notice of the existence and content (but not the truth) of the 2006 CARB report and of the 2006 and 2010 Surgeon General's reports. For the avoidance of doubt, the Court has not considered these reports or the ordinances or findings of any municipality on the issue of the fact or gravity of harm due to exposure to outdoor SHS."

The trial court heard expert testimony regarding the "basis science" of outdoor SHS. "There are material differences between exposure to SHS from indoor and outdoor smoking. Indoors, cigarette smoke mixes with the air and decays slowly over time, meaning that high concentrations of SHS can persist for long periods unless an outside air source is introduced. These characteristics of indoor SHS affect the 'dose' of exposure to nonsmokers; 'dose' being defined as the concentration level of SHS multiplied by the duration of exposure.

"By contrast, in an outdoor setting, tobacco smoke does not mix with the ambient air. Instead, it travels in an elliptical plume and always in a downwind direction. To be exposed outdoors, a subject must be downwind *and* in the plume. There is no or only minimal exposure to a subject upwind from a smoker, even at close proximity. In an outside environment, the concentration level of SHS drops to 'background' levels (essentially to nothing) soon after a cigarette is extinguished. This is unlike an indoor setting where the smoke mixes with stagnant air, causing concentration levels to remain elevated even after active smoking has stopped. Where there is more than one source of SHS—as from two or more simultaneous smokers—a downwind, non-smoking subject may be exposed to multiple plumes of SHS at the same time.

"Outdoors, the concentration level of SHS to which a downwind subject is exposed depends on a number of factors. The highest concentration levels exist on the plume line (axis) and become lower toward the periphery of the plume. As windspeed increases, the concentration level declines because the wind carries the SHS more quickly

8

past a downwind subject.  The concentration level also decreases with less stable air—stability being primarily a function of air temperature.  Most influential, however, is the proximity of the subject to the SHS sources—the closer the downwind subject is to the smoker, the higher the level of exposure.

"SHS concentration levels are measured in micrograms of particulate matter (p.m.) per meter cubed (e.g., 5 ug/m$^3$).  Particulate matter refers to one phase of emissions from tobacco and other forms of combustion.[7]

"Inside a home, it is not uncommon for SHS concentration levels to persist at levels as high as or higher than 30 ug/m$^3$.  Outdoors, a nonsmoker would have to be downwind, in the plume axis and in close proximity to a smoker to be subjected to the same exposure.  This is borne out by two experiments performed by [Birke's] expert, Professor Repace.  His studies show that at distances greater than 3 meters downwind, concentrations of smoke from a single cigarette dropped below 5 ug/m$^3$, a fraction of a typical indoor exposure level.  Professor Repace also performed outdoor SHS concentration calculations under conditions assumed to exist at [Oakwood].[8]  For a subject on the plume axis, he concluded that exposure from a single cigarette would drop below 5 ug/m$^3$ at a downwind distance of 13 feet and at a downwind distance of 40 to 50

---

7      "The particulate matter contained in SHS (outdoor and indoor) refers to so-called 2.5 micron p.m. (including 2.25 p.m., a subset of 2.5 p.m.) which are of a size small enough to be respirated by an exposed subject.  The evidence did not materially distinguish the two sizes of p.m.  In addition to particulate matter, tobacco and other forms of combustion simultaneously emit chemical gases, certain of which at significantly high levels may be independently injurious.  However, no evidence was introduced as to what dose levels may be harmful, what circumstances (outdoor/indoor) produce these levels or what, if any, injury comes from exposure to such gaseous emissions."

8      "His calculations were performed before visiting the site, but he stood by them after going to the location itself.  He also assumed that wind conditions (e.g., direction, velocity) at [Oakwood] were the same as the prevailing conditions at Los Angeles International Airport.  There is no contrary evidence, but the premise seems dubious."

9

feet from four smokers in a group. If a subject were not on the plume line, exposures in each case would be lower at even lesser distances.

"Professor Repace fairly relied on a third-party study by Neil Klepeis, et al., to corroborate his own opinion that under certain circumstances concentration levels of outdoor SHS can rival levels in indoor settings.[9] The Court does not disagree with this conclusion; the key, however, being under what circumstances *and with what consequences*. Professor Repace's reliance on Klepeis is, nonetheless, somewhat curious since Klepeis concluded that 'OTS [outdoor tobacco smoke] levels are highly dependent on sources proximity 'and [a]t distances of >2m, levels near single cigarettes were generally close to background.'

"For the most part, the parties do not disagree about what has been said so far on the science of outdoor SHS dispersion and concentration levels. But they have irreconcilably opposite views on the case-dispositive issue of whether the presence of outdoor SHS produces health or other consequences sufficient to constitute an actionable public nuisance."

"In Los Angeles, outdoor smoking is regulated only in defined areas such as restaurants and bars. (L.A. Mun. Code § 41.50 A.7.a, A.7[.]b.) Throughout the State,

---

9      "'Real-Time Measurement of Outdoor Tobacco Smoke Particles' by Neil Klepeis, et al. As a physicist, competent by education and experience, to himself opine about SHS concentration levels in outdoor environments, Professor Repace may properly rely on third-party studies or opinions. He cannot, however, transport third-party opinion or work product into the trial on subjects *outside* his own expertise. The CARB and Surgeon General's reports and the Junker Study, all dealing with the controlling issue of the harm, if any, resulting from exposure to SHS at particular levels, fall into the impermissible category. On this issue, his opinion is officious and legally incompetent. The Court rejects [Birke's] proposed Finding of Fact No. 40: '. . . Professor James Repace, rather than [Oakwood's] expert, James Seltzer, M.D., offered the more qualified and persuasive opinion on the ultimate issue that the conditions present at all the [Oakwood] outdoor common areas are injurious to the health of [Oakwood] tenants and guests . . . [.]' ([Birke's] Proposed Statement of Decision, p. 8, ¶ 40, lines 19-22.) On the contrary, the Court credits Dr. Seltzer's opinion and gives no weight whatsoever to Professor Repace's testimony on this subject."

indoor smoking is prohibited in places of employment. (Lab[.] Code[,] § 6404.5.) Smoking is also illegal within 20 feet of the entrance to a public building (Gov[.] Code[,] § 7596 et seq.) and . . . within 25 feet of a public children's playground (H[ealth] & S[af.] Code[,] § 104495)."

In the end, the trial court concluded Birke's public nuisance claim ultimately failed because she had not established conditions at Oakwood which were substantially and unreasonably harmful to health or other enumerated statutory conditions. (Civ. Code, § 3479; *Birke I, supra,* 169 Cal.App.4th at p. 1552; CACI No. 2020.) In its detailed, 72-page statement of decision, the trial court noted, in her complaint, Birke referred to the health consequences of exposure to environmental SHS and had alleged the harm attendant to these conditions is serious; "'[t]hus, the public injury resulting from [Oakwood's] alleged acts and omissions includes substantially increased risk of developing heart disease and lung cancer.'" However, she produced no competent proof of these provocative allegations; neither the CARB and Surgeon General's Reports nor the ordinances (or legislative findings) of nine municipalities in California were admitted for their truth. Further, her lone expert (Professor Repace) was not qualified to opine about risks of disease associated with exposure to SHS and testified he had not been asked to render an opinion on the "'increased risks of long-term illness.'"

"By contrast, defense expert, James Seltzer, M.D., testified without contradiction, that intermittent, transient exposure to SHS at [Oakwood's] outdoor facilities did not present a significant, increased risk of lung cancer for [Oakwood] tenants.[10] He also

---

10      The trial court noted, "Like Professor Repace in his field, Dr. Seltzer is a distinguished medical expert with particular expertise on the subject of the health effects in children and adults of exposure to SHS. He is board certified in Pediatrics and Allergy and Immunology. Among other positions he has served as the Co-director of the Pediatric Environmental Health Specialty Unit for the Environmental Protection Agency, Region 9, Chairman of the Environmental Control and Air Pollution Committee of the American Academy of Allergy, Asthma and Immunology, Chairman of the Indoor Environment Committee of the American College of Allergy, Asthma and Immunology

11

pointed out that the 2006 Surgeon General's Report which reported an increased risk of lung disease was based on studies involving subjects who had been chronically exposed to indoor SHS—circumstances quite different from the infrequent outdoor exposure in this case. Again, this testimony was uncontroverted. Finally, at the Post-trial Hearing, [Birke's] counsel made a belated and terminal concession:[]

"'So we did not prove, I think, that there are long-term consequences to exposure to second-hand smoke in these outdoor common areas. There just isn't the science there to draw that conclusion . . . [.]'

"The Court agrees. This leaves [Birke] with the theory that outdoor SHS exposure is injurious to health or offensive to the senses because it produces near-term (essentially instantaneous) irritation to the eyes, nose and throat.[11]" The trial court concluded, however, that no persuasive evidence was produced to establish that outdoor SHS increases the risk of short-term, acute injury. Birke elicited a conclusion from Professor Repace that concentration levels at Oakwood exceeded an irritation threshold (4.4 ug/m$^3$) identified in the "Junker Study." As Professor Repace was not referring to the study to corroborate his own independent opinion, but rather simply adopted the Junker Study "irritation threshold" findings as if they were true and grafted them onto his own SHS concentration level findings, the trial court found his opinion was not competent in this regard and did not credit it.

Dr. Seltzer, however, explained that at sufficient concentration levels—much higher than the "so-called Junker threshold"—SHS exposure can cause nasal congestion

and as a member of the Advisory Panel for Smoke-Free Homes. His C.V. is Exhibit 104."

11      The trial court observed: "Pervasive odor, smoke, or noise can, by themselves, 'offend the senses' so as to constitute a public nuisance. [Citations.] But this case has never been about tobacco odor or offensive smoke *per se*. [Birke] has raised much more serious concerns. For our purposes, we analyze [Birke's] proof of irritation as being both potentially injurious to health and 'offensive to the senses' without distinguishing the two. [Birke] likewise did not differentiate between them." (Original italics.)

and eye and throat irritation, but Dr. Seltzer would not expect to find irritation at the low levels Professor Repace adopted from the Junker study. He pointed out (1) that other studies (Koller) have put the level much higher (103.3 ug/m$^3$); (2) according to the Air Quality Management District, the average annual concentration level of particulate matter in the West San Fernando Valley is 11.4 ug/m$^3$; and (3) the National Air Quality acceptable standard for particulate matter is 35 ug/m$^3$. The trial court found Dr. Seltzer had credibly testified that both dose and frequency of exposure to SHS are important and occasional exposure to outdoor SHS (as when using Oakwood's outdoor amenities) by a person of average health and who does not intentionally place himself downwind in near proximity to smokers, poses less of an irritation risk than breathing ambient air in Los Angeles. As Birke's parents did, Dr. Seltzer testified he would move a child away from direct downwind exposure to SHS, not out of health concerns but just to avoid any discomfort from odor or irritation if they occurred.

"The Court does not find sufficient evidence, and certainly not preponderating evidence, that in any realistic scenario supported by the record infrequent and transient exposure to SHS at the outdoor common area venues of [Oakwood] poses an increased risk of long-term chronic illness (lung cancer or heart disease) or short-term, acute injury to health or sensibilities (irritation). This conclusion alone would require entry of judgment for Oakwood. But [Birke's] burden was even greater. To be actionable as a public nuisance, the invasion of the common interest (interference with life or property) must be both substantial and unreasonable."

Addressing these factors, the trial court noted: "To begin, there was scant evidence that significant levels of smoking were recurrent at [Oakwood] except at the main pool," and in this regard, "even if the risk of harm was a measure beyond what the record actually shows, the Court does not find a substantial interference with the 'comfortable enjoyment of life or property' . . . ." Birke devoted most of her case to the main pool area. According to Birke's father, it would be uncommon to see as many as eight people smoking there on a summer weekend or five on a summer weekday, and no

13

substantial harm or interference had been proven. Had the Junker study been admitted, the trial court observed, "even those subjects reported only 'weak' to 'very weak' reactions to more frequent and sustained exposures to SHS than would be experienced in an outdoor environment." "Even having to remain vigilant for smokers is a measure of inconvenience and annoyance. But these impositions are not so substantial as to warrant judicial intervention." After setting out the law applicable to a public nuisance cause of action and applying it to the evidence presented, the trial court concluded that "smoking in the outdoor common areas of [Oakwood] does not create conditions sufficiently offensive, annoying or unhealthy to constitute an appreciable invasion of [Oakwood's] residents' life or their enjoyment of these outdoor facilities.[]"

"The Court has determined that the likelihood and degree of long- or short-term ill effects from casual exposure to outdoor SHS at [Oakwood] do not meet the substantiality threshold for public nuisance liability. This finding alone would be fatal to [Birke's] public nuisance claim. Independently, but equally dispositive, this de minimis harm is not unreasonable; that is, the 'gravity of such harm does not outweigh the social utility of defendant's conduct.' (S[*an* ]D[*iego* ]G[*as* ] &[]E[*lectric Co. v. Superior Court* (1996)] 13 Cal.4th [893,] 938.)" On the record, the trial court noted (and Oakwood did not disagree) smoking itself had no social utility. However, Oakwood's tenants had the right to select living accommodations matching their personal preferences and legal habits; Oakwood tenants and their guests had at least a qualified "right" to smoke there and also to choose whether they wished to smoke; Oakwood, as a property owner, had the right to adopt a legal business model and to regulate, or not, the non-private activities and behaviors of tenants and guests; and Oakwood had the right to respect and not to interfere with the personal, legal choices of its tenants and invitees.

Finding Birke had failed to carry her burden of proof, the trial court entered judgment in favor of Oakwood.

Birke filed a motion to recover her attorney fees pursuant to Code of Civil Procedure section 1021.5 which the trial court denied.

14

Birke appeals from the judgment and denial of her motion for attorney fees.[12]

## *DISCUSSION*

### **The Judgment Is Supported by Substantial Evidence.**

*Standard of Review.*

Birke argues she proved the elements of a public nuisance, but in conducting a substantial evidence review, we "must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630, citations omitted.) "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment. Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Id.* at pp. 630-631, original italics.)

*Public Nuisance Law.*

As we stated in *Birke I, supra,* 169 Cal.App.4th 1540, "'The public nuisance doctrine is aimed at the protection and redress of *community* interests and, at least in theory, embodies a kind of collective ideal of civil life which the courts have vindicated by equitable remedies since the beginning of the 16th century.' (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1103 [60 Cal. Rptr. 2d 277, 929 P.2d 596] (*Acuna*).) 'To qualify, and thus be enjoinable, the interference [with collective social interests] must be

---

[12]     These appeals have been consolidated.

both *substantial* and *unreasonable. . . .* " ' . . . It is an obvious truth that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference and must take a certain amount of risk in order that all may get on together.' " ' " ([*Acuna*, *supra,* 14 Cal.4th] at p. 1105[, original italics].)

"The Civil Code defines a public nuisance and the elements that must be pleaded by a private person suing to abate it. Civil Code section 3479 provides: 'Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance.' Civil Code section 3480 provides: 'A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.' Civil Code section 3493 provides: 'A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise.'" (*Birke I, supra,* 169 Cal.App.4th at pp. 1547-1548.)

In order to prove a cause of action for public nuisance based on the presence of secondhand (or environmental) tobacco smoke in the outdoor common areas of her apartment complex, Birke was required to prove: "(1) Oakwood and the various related entities that manage and operate the apartment complex in Woodland Hills in which the Birke family resides, by acting or failing to act, created a condition that was harmful to health or obstructed the free use of the common areas of the apartment complex, so as to interfere with the comfortable enjoyment of life or property; (2) the condition affected a substantial number of people at the same time; (3) an ordinary person would be reasonably annoyed or disturbed by the condition; (4) the seriousness of the harm outweighs the social utility of Oakwood's conduct; (5) neither Birke nor her parents consented to the conduct; (6) Birke suffered harm that was different from the type of harm suffered by the general public; and (7) Oakwood's conduct was a substantial factor

in causing Birke's harm.  (See Judicial Council of Cal. Civ. Jury Instns. (2008) CACI No. 2020.)"  (*Birke I, supra,* 169 Cal.App.4th at p. 1548.)

As Birke concedes, "'not every interference with collective social interests constitutes a public nuisance.  To qualify, and thus be enjoinable, the interference must be both *substantial* and *unreasonable*.'"  (*Acuna, supra,* 14 Cal.4th at p. 1105; *Melton v. Boustred* (2010) 183 Cal.App.4th 521, 542.)  She ignores the evidence credited and rejected by the trial court supporting the court's determination she failed to carry her burden failure of proof, arguing instead the "injury and interference elements have been established by the Legislature and the agency it created to classify air pollutants."

She says the trial court subverted the Legislature's intention to protect Californians from SHS "to the fullest extent possible" as evidenced by Health and Safety Code section 104350, which states, in pertinent part, that "Involuntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers," and the "elimination of smoking is the number one weapon against four of the five leading causes of death in California . . . ."  It appears Birke has confused a nuisance in fact and a nuisance per se.

As we noted in *Birke I, supra,* 169 Cal.App.4th at page 1552, footnote 6, "Significantly, Birke does not allege the presence of secondhand tobacco smoke is a nuisance per se, which could be enjoined without proof of its injurious nature or a weighing of the utility of Oakwood's conduct against the gravity of the harm."  Citing *Lussier v. San Lorenzo Valley Water Dist.* (1988) 206 Cal.App.3d 92, 106, footnote 10, we noted that it is for the finder of fact to determine "whether something, not deemed a nuisance per se, is a nuisance *in fact*, i.e., in a particular instance."  (Original italics.) "'[A] nuisance per se arises when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular object or substance, activity, or circumstance, to be a nuisance. . . .  [T]o rephrase the rule, to be considered a nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law.'  (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1206–1207 [52 Cal.

17

Rptr. 2d 518].)  '[W]here the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made . . . .' (*Id*. at p. 1207.)  '"Nuisances *per se* are so regarded because no proof is required, beyond the actual fact of their existence, to establish the nuisance." [Citations.]' (*City of Costa Mesa v. Soffer* (1992) 11 Cal.App.4th 378, 382 [13 Cal. Rptr. 2d 735], fn. omitted.)" (*People ex rel. Trutanich v. Joseph* (2012) 204 Cal.App.4th 1512, 1524.)

Yet, several of Birke's arguments on appeal amount to claims she had no obligation to provide proof of anything other than the fact Oakwood allowed smoking to take place in its outdoor common areas, without a statutory determination of smoking as a nuisance per se on which to rely.

Health and Safety Code section 104350 does not establish smoking as a nuisance per se.[13]  Indeed, notwithstanding the language of section 104350, Birke ignores the fact

---

[13]    Health and Safety Code section 104350 provides:

"(a) The Legislature finds and declares as follows:

"(1) Smoking is the single most important source of preventable disease and premature death in California.

"(2) More than 30 percent of coronary heart disease cases are attributable to cigarette smoking.

"(3) More than 30 percent of all annual cancer deaths are attributable to smoking, with lung cancer now the leading cancer killer in women as well as men.

"(4) Smoking is responsible for one-quarter of all deaths caused by fire.

"(5) *Involuntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers*.

"(6) More than 80 percent of chronic obstructive lung diseases including emphysema and chronic bronchitis are attributable to smoking.

"(7) Tobacco-related disease places a tremendous financial burden upon the persons with the disease, their families, the health care delivery system, and society as a

18

that while Health and Safety Code section 104495, subdivision (b), for example, prohibits smoking within 25 feet of any playground or tot lot sandbox area, subdivisions (f) and (g) specify that this prohibition "shall not apply to private property" and "shall not apply to a public sidewalk located within 25 feet of a playground or a tot lot sandbox area."[14] Since

whole. California spends five billion six hundred million dollars ($5,600,000,000) a year in direct and indirect costs on smoking-related illnesses.

(8) The elimination of smoking is the number one weapon against four of the five leading causes of death in California.

"(9) Keeping children and young adults from beginning to use tobacco and encouraging all persons to quit tobacco use shall be the highest priority in disease prevention for the State of California. More than 60 percent of all smokers begin smoking by the age of 14, and 90 percent begin by the age of 19.

"(10) The State of California shall play a leading role in promoting a smoke-free society by the year 2000 and thereby supporting the National Health Status Objectives for the year 2000 relating to smoking and tobacco use.

"(b) It is the intent of the Legislature, therefore, to require the department, local lead agencies, and the State Department of Education to cooperatively and individually conduct activities directed at the prevention of tobacco use and tobacco-related diseases. The campaign shall focus on health promotion, disease prevention, and risk reduction, utilizing a 'wellness' perspective that encourages self-esteem and positive decisionmaking techniques. It is also the intent of the Legislature that, for the purpose of program planning and program evaluation, the department provide data and technical information on tobacco-related diseases, tobacco use and its consequences, and effective personal and community interventions to prevent tobacco use." (Italics added.)

[14] Health and Safety Code section 104495 provides as follows:

"(a) For the purposes of this section, the following definitions shall govern:

"(1) 'Playground' means any park or recreational area specifically designed to be used by children that has play equipment installed, or any similar facility located on public or private school grounds, or on city, county, or state park grounds.

"(2) 'Tot lot sandbox area' means a designated play area within a public park for the use by children under five years of age. Where the area is not contained by a fence, the boundary of a tot lot sandbox area shall be defined by the edge of the resilient surface

19

the Legislature has not declared smoking to be a nuisance per se, it follows Birke was

---

of safety material, such as concrete or wood, or any other material surrounding the tot lot sandbox area.

"(3) 'Public park' includes a park operated by a public agency.

"(4) 'Smoke or smoking' means the carrying of a lighted pipe, lighted cigar, or lighted cigarette of any kind, or the lighting of a pipe, cigar, or cigarette of any kind, including, but not limited to, tobacco, or any other weed or plant.

"(5) 'Cigarette' means the same as defined in Section 104556.

"(6) 'Cigar' means the same as defined in Section 104550.

"(b) *No person shall smoke a cigarette, cigar, or other tobacco-related product within 25 feet of any playground or tot lot sandbox area.*

"(c) No person shall dispose of cigarette butts, cigar butts, or any other tobacco-related waste within 25 feet of a playground or a tot lot sandbox area.

"(d) No person shall intimidate, threaten any reprisal, or effect any reprisal, for the purpose of retaliating against another person who seeks to attain compliance with this section.

"(e) Any person who violates this section is guilty of an infraction and shall be punished by a fine of two hundred fifty dollars ($250) for each violation of this section. Punishment under this section shall not preclude punishment pursuant to Section 13002, Section 374.4 of the Penal Code, or any other provision of law proscribing the act of littering.

"(f) *The prohibitions contained in subdivisions (b), (c), and (d) shall not apply to private property.*

"(g) The prohibitions contained in subdivisions (b) and (c) shall not apply to a public sidewalk located within 25 feet of a playground or a tot lot sandbox area.

"(h) This section shall not preempt the authority of any county, city, or city and county to regulate smoking around playgrounds or tot lot sandbox areas. Any county, city, or city and county may enforce any ordinance adopted prior to January 1, 2002, or may adopt and enforce new regulations that are more restrictive than this section, on and after January 1, 2002." (Italics added.)

required to establish the nuisance she alleged resulted from smoking in the outdoor common areas at Oakwood to constitute "a nuisance *in fact,* i.e., in a particular instance." (See *Lussier v. San Lorenzo Valley Water Dist., supra,* 206 Cal.App.3d at p. 106, fn. 10, original italics.)

Similarly, she says the trial court was required to take judicial notice of the truth of findings by some California cities—*cities other than the city where her Oakwood apartment was located*—"many of which define outdoor [SHS] as a nuisance" and says Evidence Code section 664, which states (as relevant) that "[i]t is presumed that official duty has been regularly performed," creates a presumption the ordinances of these other cities declaring SHS harmful are true. She has no authority for such a proposition, and the trial court properly rejected it.

Birke also argues the trial court exceeded its jurisdiction by issuing a decision countermanding the CARB's findings of harm from outdoor SHS. She says the trial court had no authority to require proof of harm apart from the CARB's findings and then reached a result abrogating the CARB's findings and authority in violation of the separation of powers doctrine. We disagree. Again, the CARB report findings (which Birke does not even cite or identify in the record) are not a substitute for evidence of the elements of Birke's public nuisance cause of action. "'[T]he taking of judicial notice of the official acts of a governmental entity does not in and of itself require acceptance of the truth of factual matters which might be deduced therefrom, since in many instances what is being noticed, and thereby established, is no more than the existence of such acts and not, without supporting evidence, what might factually be associated with or flow therefrom.'" (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063-1064, overruled on another ground in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.) For the reasons the trial court explained in its statement of decision, Birke simply failed to carry her burden of proof.

Birke says Dr. Seltzer's opinion was irrelevant because he did not testify that he had conducted studies of his own, but given his qualifications as a medical doctor with expertise in asthma, allergies and immunology as well as environmental pollution, she

21

fails to establish any error in the trial court's acceptance of this expert's opinion evidence where appropriate (as the trial court properly considered Professor Repace's opinions as they related to his expertise in the field of physics). (*Howard v. Owens Corning, supra,* 72 Cal.App.4th at pp. 630-632.) For the reasons given by the trial court, it was within its fact-finding role to credit or reject the expert witnesses' evidence as it did. (*Beck Development Co. v. Southern Pacific Transportation Co., supra,* 44 Cal.App.4th at p. 1206.)

Birke says the trial court improperly denied her request to reopen her case. We disagree. The trial court did not err in declining to allow Birke to recall Professor Repace to testify as to long-term risk of illness given the fact he had not been asked to give an opinion in this regard and further was not qualified, as a physicist, to do so. Moreover, she made no offer of proof to reopen her case as to other Oakwood defendants.

***Birke Has Failed to Demonstrate Error in the Trial Court's Denial of her Motion for Attorney Fees.***

As relevant, Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."[15]

As a preliminary matter, private attorney general fees are available under section 1021.5 only to a "successful" party. (*Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 439.) Birke essentially argues she was partially successful because she obtained this court's published decision in *Birke I, supra,* 169 Cal.App.4th 1540; as a result she says, regardless of the outcome in her own case, she vindicated the important

_____

[15]    All further statutory references are to the Code of Civil Procedure.

public right of apartment residents to require landlords to answer in court "for taking a laissez faire approach to smoking on their properties." We disagree.

Although the terms "prevailing party" and "successful party," as used in section 1021.5, are synonymous, it is also true that in the context of section 1021.5, the plaintiff's action need not have resulted in a favorable final judgment—as long as the plaintiff has achieved its litigation objectives. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 570-571 (*DaimlerChrysler*).) In all cases, however, "whether a party has been successful is measured by the resolution of the *action*, not an ancillary part of the litigation. (See, e.g., *DaimlerChrysler*, *supra*, 34 Cal.4th at p. 567 [it is the impact of the action on modifying the defendant's behavior, not whether it results in a final judgment, that is determinative of whether a plaintiff is successful under § 1021.5]; *Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 684–685 [186 Cal. Rptr. 589, 652 P.2d 437] [a plaintiff may be successful party in action under § 1021.5 even though the defendant's motion for summary adjudication of certain claims was resolved in the defendant's favor; success is determined not on 'appearance,' but '"whether or not the *action* served to vindicate an important right"' (italics added)]; *Woodland Hills Residents Assn., Inc.*[ *v. City Council* (1979)] 23 Cal.3d [917,] 938 [§ 1021.5 award of attorneys fees to the plaintiff proper even where the plaintiff *won the case* on a preliminary issue].)" (*Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Markets, Inc.* (2005) 127 Cal.App.4th 387, 402-403, original italics.)

In this case, notwithstanding our decision to publish our opinion in the prior appeal, Birke cannot claim her lawsuit was a "'*catalyst* motivating defendant[ Oakwood] to provide the primary relief [she] sought,'" or that she "'activat[ed] defendant[ Oakwood] to modify [its] behavior.'" (*Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 353, original italics, citation omitted.) In *Birke I,* we determined: "Whether or not her claims can survive a properly supported summary judgment motion, let alone prevail following a trial," Birke had stated a cause of action for public nuisance sufficient to withstand demurrer. (*Birke I, supra,* 169 Cal.App.4th at p. 1543.) "To be sure," we noted, "Birke may not be able to prove the seriousness of the

23

harm she has alleged or establish the harm outweighs the social utility of Oakwood's conduct." (*Id.* at p. 1551, citation omitted.) Indeed, at trial, she was not "successful" by any definition.

As the court in *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2010) 187 Cal.App.4th 376, 387-388, stated: "Here, plaintiffs lost because the record did not justify their winning under the law. While it may be argued that their contentions resulted in clarification of legal issues, the fact remains that contentions do not supplant evidence. The real problem is that regardless of the expansion of the law, they did not have a factually meritorious lawsuit and, when the dust settled, their only victory was in a statement of law that when applied to the record clarified why they should lose." (See also *id.* at p. 387 [it would be "anomalous that a party could bring a lawsuit, lose the lawsuit and effectively lose with respect to the goal of their lawsuit and still require the [defendant] to pay for their attorney fees"].) It follows that the trial court did not abuse its discretion in denying Birke's motion for attorney fees. (*Id.* at p. 388.) Birke cannot be considered a successful party, and she was not entitled to an award of attorney fees under Code of Civil Procedure section 1021.5. (*Ibid.; Woodbury v. Brown-Dempsey, supra,* 108 Cal.App.4th at p. 439.)

### DISPOSITION

The judgment is affirmed. The order denying Birke's motion for attorney fees is affirmed. Oakwood is to recover its costs on appeal.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                    **JACKSON, J.**

24